[No. B185547. Second Dist., Div. Seven. Apr. 2, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ADAN ALBARRAN, Defendant and Appellant.

COUNSEL

Nasatir, Hirsch, Podberesky & Genego, William J. Genego and Richard G. Hirsch for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Pamela C. Hamanaka, Assistant Attorneys General, Kenneth N. Sokoler and Susan Lee Frierson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WOODS, J.**—Adan Albarran appeals his convictions for attempted murder, shooting at an inhabited dwelling and attempted kidnapping for carjacking. In connection with these offenses, the People asserted gang enhancements pursuant to Penal Code section 186.22, alleging the crimes were committed for the benefit of a criminal street gang. Prior to trial Albarran sought to exclude evidence of his gang affiliation and the other gang evidence arguing it was irrelevant to the charges and was inadmissible under Evidence Code section 352. After conducting an Evidence Code section 402 hearing, the court concluded a sufficient factual foundation existed to support the gang allegations and that the gang evidence was relevant (and not overly prejudicial) on the issues of intent and motive for the underlying charges. The jury convicted Albarran, and found the gang allegations true. Thereafter, Albarran filed a motion for a new trial asserting sufficient evidence did not support the gang allegations and that admission of irrelevant and prejudicial gang evidence warranted a new trial on all charges. The trial court granted the new trial motion with respect to the gang allegations, but denied it as to the underlying charges, finding the gang evidence was relevant to issues of intent.

On appeal from the judgment, Albarran asserts the trial court should *not* have admitted the gang evidence in the first instance (and/or should have granted his new trial motion in its entirety) because the gang evidence was completely irrelevant and highly prejudicial. He further asserts the erroneous admission of this evidence constituted prejudicial error under state law and also rendered the trial fundamentally unfair, in violation of federal due process. As we shall explain, the trial court should have granted Albarran a new trial on all charges. Our review of the entire record convinces us that certain extremely prejudicial gang evidence was not relevant to the underlying charges; the People failed to present sufficient evidence these crimes were gang motivated. Furthermore, given the highly inflammatory nature of the gang evidence presented, we cannot say the error in admitting the evidence was harmless.

## FACTUAL AND PROCEDURAL HISTORY

.**The Crimes.** On March 14, 2004, Michael Bacelis hosted a birthday party for a family member at his home in Palmdale. About 1:00 a.m., Bacelis, who was in an upstairs bedroom putting a child to bed, heard gunfire from outside in front of his house. At the time there were still 20 to 25 people in the house and backyard. After the gunfire began, Bacelis ran to the front entrance of his house. He observed two male Hispanics with shaved heads standing about three houses away, holding guns. One of the young men had a shotgun while the other had a handgun. They continued to fire at the front of Bacelis's house.

Bryan Monterrosa was sitting in a parked car near Bacelis's house. He also heard the gunfire and looked up and saw two young men with guns pointed at the house. One of the shooters stood 7 to 10 feet away from Monterrosa and the other shooter, later identified as Albarran, was holding a handgun and stood about a foot away from where Monterrosa sat inside the car. When interviewed by police, Monterrosa identified the shooters as Hispanic males with shaved heads. Monterrosa did not identify Albarran as one of the shooters; he stated he did not see their faces well enough to recognize either of them.[1]

After the shooting stopped, Bacelis jumped into his SUV, which was parked in front of his house, and began to follow the shooters as they fled down the street on foot. The young men turned a corner and as Bacelis turned he saw a car with its lights off at the end of that street. The car appeared to be backing up; it then came to a stop and Bacelis saw the two shooters jump into the car. Bacelis initially thought the car was the getaway vehicle and he proceeded toward it. The car turned left in front of Bacelis's SUV and Bacelis crashed his car into it. Two males jumped out of the car and fled on foot. Bacelis was unable to identify the shooters.

The car was driven by Lizette Arvizu, Bacelis's neighbor. According to Arvizu, shortly before her car was struck by Bacelis's SUV, she had driven to the area with her cousin, Andrea, her friend Monique and Monique's cousin Frankie. Lizette was driving, Andrea rode in the front passenger seat and Monique and Frankie sat in the backseat. Lizette had been driving toward Monique's house when she heard gunfire and saw people running toward her car. Lizette put her car in reverse intending to back out of the area. A male holding a long gun suddenly jumped into the backseat of the vehicle. The male told her to "just drive, go." As she started to make a left turn to leave the area, her car was struck by Bacelis's SUV. Monique testified that she was struck in the head by the long gun. After the collision, another male jumped into the backseat and Frankie jumped out and ran. The second male carried a shorter gun and may also have said "drive" or "go." Lizette told the young men to get out of the car because it would not drive. Both young men got out and fled on foot. The young women stated they were frightened, upset, and under stress but also got quick (one-to-two second) glances at both young men. They told the jury the second male was a Hispanic teenager.[2]

---

[1] Monterrosa went to middle school with Albarran. Monterrosa agreed that if Albarran had been one of the two shooters he would have been able to recognize him.

[2] Some of their trial testimony was inconsistent with information the young women provided to police at the scene. According to the police detective who interviewed the women the evening of the incident, they identified the assailants as "adult" Hispanics. Furthermore, according to the officer, the women never mentioned that Frankie was in the car with them. In addition, they also initially told police that *both* suspects jumped into the car before it was

About six weeks later, Lizette, Andrea and Monique identified Albarran from a one-of-six-array photo lineup. The young women stated Albarran was the second male who carried the small handgun. Though none of the young women had mentioned it to the police during the investigation, the young women said they recalled the second young man had a small mole/birthmark on his face and recognized Albarran from the photos because he too had a small mole/birthmark on his face. The young women also conceded that they discussed the facts, including their respective identifications, on a number of occasions.

**Albarran's Arrest and the Trial Proceedings.** According to Deputy Robert Gillis (the deputy who arrested Albarran), when Albarran was taken into custody, Albarran told the officer: "Man, this is messed up. We jumped into that bitch's car when we got in that shooting and she drove us out of the area." The officer also stated Albarran remarked: "Well, whatever. She got hit by a guy and I just told her to go, go, go."

Albarran was charged with: (1) attempted willful, deliberate and premeditated murder of Michael Bacelis (count 1); (2) shooting at an inhabited dwelling (count 2); (3) three counts of attempted kidnapping for carjacking (as to Lizette Arvizu, Andrea Arvizu and Monique Gonzalez) (counts 3–5); and (4) three counts of attempted carjacking (as to Lizette Arvizu, Andrea Arvizu and Monique Gonzalez) (counts 6–8). As to each charge the People also alleged various enhancements,[3] including a gang enhancement pursuant to Penal Code section 186.22. The enhancement alleged the crimes had been committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang members.

Prior to trial Albarran filed a motion to challenge the admission of any evidence of Albarran's gang affiliation and evidence concerning whether the crimes were gang related as irrelevant. He also argued the evidence was inadmissible under Evidence Code section 352. The prosecutor argued the case presented a "classic" gang shooting and that the entire purpose of the shooting was to gain respect and enhance the shooters' reputations within the gang community, and to intimidate the neighborhood—essentially to "earn one's bones" within the gang. The prosecutor noted, however, that he had no percipient witness or evidence to prove the crime was gang related or motivated, but instead would be relying on testimony of the sheriff's gang expert, Deputy Gillis, who was most familiar with Albarran and his gang, the 13 Kings.

---

struck by the SUV. The young women also gave inconsistent information concerning which car door each of the suspects used to get in their car.

[3] The People also alleged various firearm enhancements.

During the Evidence Code section 402 hearing, Deputy Gillis testified to his numerous contacts with Albarran and to Albarran's admission that he was an active member of the 13 Kings street gang. Deputy Gillis described the types of crimes committed by the 13 Kings, Albarran's gang tattoos, and gang graffiti at Albarran's house. While he conceded he was aware of no direct evidence (no gang signs shown, announcements or gang graffiti) that specifically linked the 13 Kings or Albarran to these crimes, he believed the offenses were gang related because there were two shooters involved, and the crime would intimidate people. Gillis conceded, however, he did not know the exact reason for the shooting, though he was told there were members of another gang, Los Compadres, at the house.

The court denied Albarran's Evidence Code section 402 motion, concluding that the prosecutor had laid a sufficient foundation for the expert testimony on the gang enhancements and gang evidence (including Albarran's gang affiliation, tattoos, gang behavior, activities, crimes). The court also concluded the evidence was relevant to the issues of motive and intent as to the underlying charges. The trial court further noted it had assessed the evidence under Evidence Code section 352 and determined that its probative value outweighed any resulting prejudice.

The case proceeded to trial. During the prosecutor's opening argument, he made a number of references to Albarran being a member of a "dangerous" street gang, the 13 Kings. The prosecutor also showed a picture of Albarran's gang tattoos, describing one of the tattoos as a "reference to the Mexican Mafia, which is a violent prison street gang that controls the Hispanic street gangs." The prosecutor noted that when a person has such a tattoo it shows allegiance to the Mexican Mafia.

During the trial, two other sheriff's deputies, in addition to Deputy Gillis, testified that Albarran was a member of the 13 Kings street gang. Deputy Gillis testified he had 20 face-to-face contacts with Albarran in the prior two years. He described in detail Albarran's gang involvement, his tattoos and his gang moniker, "Flaco." He testified that the shooting occurred in the 13 Kings' gang area not far from Albarran's home. Deputy Gillis stated Albarran had been "jumped into" the gang and that Albarran's brother had been recently jumped in as well. Deputy Gillis explained Albarran had a number of gang tattoos, including one referencing the Mexican Mafia. He also testified concerning the prevalence of 13 Kings graffiti around Albarran's home. Deputy Gillis described one piece of graffiti he attributed to Albarran's gang which contained a specific threat to murder police officers. He also identified

a number of 13 Kings gang members by name and monikers and described arresting them. Gillis told the jury the 13 Kings committed a number of criminal offenses, including robberies, driveby shootings, carjackings, and felony vandalism. Deputy Gillis explained how gang members gain respect by committing crimes and intimidating people. Deputy Gillis stated that during the commission of a crime a gang member makes himself known and can gain respect by showing or "throwing" gang signs, yelling out an announcement of his presence or tagging. Gillis conceded that there was no evidence in this case that any of the shooters had made themselves known— the shooters made no announcements, did not throw any gang signs and there was no graffiti referring to the crime. Nonetheless, Gillis insisted that the shooters would gain respect within the gang absent such evidence because the people present at the party would know who was present at the party and would also know the shooters. Deputy Gillis testified that "by word of mouth, word on the street," it was known the Los Compadres gang was at the party.

Deputy Gillis opined that the shooting of Bacelis's house was gang related and intended to benefit the 13 Kings street gang because: (1) the shooting occurred in Palmdale; (2) it occurred at a party and gang members often commit crimes during parties; and (3) more than one shooter was involved. Deputy Gillis stated that when these crimes were committed the 13 Kings were involved in an active gang war. Deputy Gillis also testified that Michael Bacelis was a member of another gang, the Pierce Boys Gang, but he admitted he was unfamiliar with the Pierce Boys Gang and knew of no rivalry between Albarran's gang and the Pierce Boys Gang.

Deputy Gillis also described how Albarran had "confessed" to his involvement in the shooting when Gillis arrested him. Before Deputy Gillis was cross-examined, the court admonished the jury concerning the limited use of the evidence—the court told the jury that the gang evidence could not be considered to prove that Albarran was a person of bad character or that he had a disposition to commit crimes, but could only be considered if it tended to show that the crimes committed were for the benefit of a street gang. The jury was also instructed pursuant to CALJIC No. 2.09 concerning the proper and limited use of the gang evidence.

Albarran presented an alibi defense from a number of family members and friends who testified Albarran was at a party with his family in Sun Valley at the time of the shooting.

During his closing, the prosecutor made a number of references to Albarran's gang involvement. He told the jury that the crime was gang motivated.[4] The prosecutor also argued that because Albarran was a gang member his alibi was unbelievable. He also warned the jury not to be fooled by Albarran's "altar boy" appearance at trial; he reminded the jury that Albarran was an active member of the 13 Kings with gang tattoos.

The jury convicted Albarran on counts 1 through 5 and found him not guilty on counts 6 through 8.[5] As to counts 1 through 5 the jury also found the gang enhancement allegation true.

Albarran filed a motion for a new trial asserting that insufficient evidence supported the gang enhancement allegations. He also asked for a new trial on the underlying charges, arguing that absent the gang allegations, the gang evidence was irrelevant and overly prejudicial. The court granted the new trial motion as to the gang enhancements and denied it as to the underlying charges. The gang allegations were dismissed without prejudice.

Albarran appeals.

## DISCUSSION

Before this court, Albarran complains the gang evidence presented at his trial was irrelevant and inadmissible. Specifically he argues the trial court should have excluded the evidence prior to trial.[6] In any event, Albarran

---

[4] The prosecutor stated: "Mr. Albarran has a ton of motive, a ton of motive. He's a gang member. . . . You've seen the tattoos. This shooting happens in his gang area, near his home, near his work. That's what gangsters do. Don't kid yourself. Nobody is—Gangsters, what they do is engage in violent crime and they shoot at people and they shoot at houses. That is what they do. That's how they earn their bones. That's how they move up in gang. That's what they do. He's got a ton of gang motivation to conduct a gang shooting in his own gang area. That's a motive for the crime. He wasn't plucked off the planet somewhere like that. He had a ton of motive to shoot at that house, because that's what gang members do in order to get bragging rights in their own gang, in order to move up in their gang. That's what they do. He's got a ton of motive."

[5] Counts 6 through 8 were charged as lesser offenses to counts 3 through 5 and the jury was instructed that counts 6 through 8 were alternative charges to counts 3 through 5.

[6] In Albarran's opening brief he asserts "the evidence at the pretrial § 402 hearing failed to establish a sufficient foundation for the admission of the prosecution's proffered gang evidence. . . ." In other words, Albarran asserts here, as he did at the hearing on the new trial motion, that the gang evidence should not have been admitted in the first instance. Albarran further claims this court need not determine whether the trial court abused its discretion in its pretrial ruling, because "[e]ven assuming *arguendo*, the pretrial ruling was not an abuse of discretion, the court's post-trial determination that the gang evidence was insufficient to prove the crime was gang related confirms, . . . it should not have been admitted." Albarran continues "the gang evidence would not have been admissible at a trial on the underlying charges absent

asserts, the court thereafter having found the gang evidence was insufficient to prove the gang allegations, should have also concluded the gang evidence was irrelevant and unduly prejudicial as to the underlying charges, and thus, the court should have granted his new trial motion in its entirety. Albarran further asserts the erroneous admission of the gang evidence requires reversal because it amounts to prejudicial error under state law and deprived him of his constitutional due process rights under federal law to a fair trial. We address Albarran's contentions in turn.

### A. *Admission of Gang Evidence.*

■ California courts have long recognized the potentially prejudicial effect of gang membership. As one California Court of Appeal observed: "It is fair to say that when the word 'gang' is used in Los Angeles County, one does not have visions of the characters from the 'Our Little Gang' series. The word gang . . . connotes opprobrious implications. . . . [T]he word 'gang' takes on a sinister meaning when it is associated with activities." (*People v. Perez* (1981) 114 Cal.App.3d 470, 479 [170 Cal.Rptr. 619].) Given its highly inflammatory impact, the California Supreme Court has condemned the introduction of such evidence if it is only *tangentially* relevant to the charged offenses. (*People v. Cox* (1991) 53 Cal.3d 618, 660 [280 Cal.Rptr. 692, 809 P.2d 351].) In fact, in cases not involving gang enhancements, the Supreme Court has held evidence of gang membership should not be admitted if its probative value is minimal. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047 [16 Cal.Rptr.3d 880, 94 P.3d 1080].) "Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449 [69 Cal.Rptr.2d 16].)

Thus, as general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192 [24 Cal.Rptr.3d 887].) Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect. (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66

---

the gang allegation." Thus, contrary to what the dissenting opinion seems to suggest, Albarran did not concede that the trial court properly admitted the gang evidence prior to trial, nor for the purpose of appeal has he abandoned a claim the court erred in admitting the evidence pretrial.

Cal.Rptr.2d 123, 940 P.2d 710]; see generally Evid. Code, § 352.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the·like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049.) Nonetheless, even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury. (*People v. Williams, supra,* 16 Cal.4th at p. 193; *People v. Carter* (2003) 30 Cal.4th 1166, 1194 [135 Cal.Rptr.2d 553, 70 P.3d 981] [evidence of defendant's gang membership although relevant to motive or identity creates a risk the jury will improperly infer defendant has a criminal disposition and is therefore guilty of the charged offense and thus must be carefully scrutinized].)

We review the court's order·denying the motion for a new trial de·novo. (*People v. Ault* (2004) 33 Cal.4th 1250, 1262 [17 Cal.Rptr.3d 302, 95 P.3d 523].)[7] Nonetheless, the decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the

---

[7] The California Supreme Court has stated that in cases in which the trial court grants a new trial order, the standard of review is abuse of discretion. (*People v. Ault, supra,* 33 Cal.4th at pp. 1260–1261.) However, in cases such as this, where the trial court denied the motion for a new trial, the authorities are less clear regarding the·standard of review. (*Id.* at p. 1262, fn. 7 [noting the lack of uniformity in the standard of review].)

For example, in *People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87] (*Nesler*), ·the California Supreme Court stated: "Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination." Yet in *People v. Williams,* the court provided little explanation for its decision to apply an abuse of discretion standard, stating simply: " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " (*People v. Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221] (*Williams*); see also *People v. Carter* (2005) 36 Cal.4th 1114, 1210 [32 Cal.Rptr.3d 759, 117 P.3d 476] (citing *Williams*).)

While *Williams* and *Carter* contain little or no discussion of the standard of review for denials of new trial motions, the *Nesler* court provides extensive analysis. In *Nesler,* the criminal ·defendant moved for a new trial on grounds of juror misconduct. The trial court denied the defendant's motion, and the Court of Appeal affirmed. Our Supreme Court reversed, holding that the trial court erred in concluding there was no substantial likelihood the juror's misconduct demonstrated her "actual bias." The court stated the standard of review of the ruling on the motion for new trial as follows: "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]" (*Nesler, supra,* 16 Cal.4th 561, 582, fn. omitted (lead opn. of George, C. J.).) In a footnote further explaining the standard of the review, the *Nesler* court stated: "appellate courts . . . conduct an independent review of whether a defendant was prejudiced by juror misconduct . . . ." (*Nesler, supra,* 16 Cal.4th 561, 582, fn. 5 (lead opn. of George, C. J.).) The court further opined "that in reviewing an order denying a motion for new trial based upon jury misconduct, the reviewing

discretion of the trial court. (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1], original italics; see *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369–1370 [37 Cal.Rptr.2d 596].) It is appellant's burden on appeal to establish an abuse of discretion and prejudice. (*People v. Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79].)

In his pretrial motion to exclude the gang evidence, Albarran argued the gang evidence was irrelevant and otherwise inadmissible under Evidence Code section 352. In connection with his motion for new trial he argued that the gang evidence was irrelevant to the underlying charges, inflammatory, unduly prejudicial, and constituted "bad character" evidence.

At the hearing on the new trial motion, the court announced its tentative ruling to grant the motion as to the gang allegation and to deny it as to the underlying charges. The court then gave both sides an opportunity to argue.

Albarran agreed with the court's view that the evidence presented at trial was insufficient to support the gang allegation. He also asserted, however, that the gang evidence admitted was only relevant to the gang allegation and that absent the gang allegation none of the other gang evidence was relevant or admissible to the underlying charges. Albarran argued that but for the gang evidence he would have been acquitted. The court then asked Albarran whether at least "some" of the gang evidence would have been admissible even without the gang allegation. Albarran answered in the negative. The court disagreed, responding that gang evidence is admissible absent a Penal Code section 186.22 allegation for the limited purpose to prove motive and intent. Albarran then responded that the evidence was nonetheless inadmissible because there was no evidence of any particular motive in the case and

court has a constitutional obligation to determine independently whether the misconduct prevented the complaining party from having a fair trial. [Citation.]" (*Nesler, supra,* at p. 582, fn. 5, italics omitted (lead opn. of George, C. J.).)

Of particular importance to the *Nesler* court in evaluating the standard of review for the denial of a new trial motion was the fact that the question presented implicated the constitutional rights of the defendant.

We believe the *Nesler* court's rationale for applying independent review when a question implicates a significant constitutional issue is inherently sound. Because the present case, like *Nesler,* implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial, we will apply the de novo standard of review. In any event, even were a more deferential standard of review applied here, our conclusion would be the same.

that the gang evidence was used to create a motive not otherwise suggested by the evidence. When the prosecutor was given an opportunity to speak, he stated his agreement with "the court's analysis with respect to the relevance of gang evidence when there is no longer a gang allegation . . . . that it is relevant to motive [and] intent." The prosecutor continued that in his view "what we're left with . . . it's a 352 issue . . . what is the weight of the evidence against Mr. Albarran in making a determination on that 352 issue and whether or not that evidence was—its probative value is substantially outweighed by its prejudicial effect." The prosecutor also emphasized that at the pretrial Evidence Code section 402 hearing the court admitted the evidence to prove the gang allegation and to prove motive and intent for the underlying charges.[8]

At the conclusion of the argument the court stated: "The court did consider the arguments raised that the sheer introduction of the gang evidence in and of itself, in essence, poisoned the well and was too prejudicial and inflammatory. In its review of the evidence, the court considered the independent strength of the evidence, including the identifications in this case. The statements attributed to the defendant, in determining whether or not the gang evidence that did come in, which the court would not describe as being overwhelming, but whether or not that gang evidence in and of itself, if it did come in, would affect the jury's verdict as to the remaining charges. The court's opinion is that it would not have affected the verdict one way or the other."

Though the trial court did not expressly so state, a fair reading of the transcript from the hearing on the new trial motion indicates the trial court held the view that at least some of the gang evidence was relevant and admissible to the issue of motive or intent for the underlying crimes, irrespective of the fact that the gang evidence was not sufficient to prove the gang allegations (i.e., that the crimes were gang related and/or committed for the benefit of a criminal street gang). The same bench officer presided over the pretrial, trial and posttrial proceedings. The court's question and comments at the hearing on the new trial motion concerning the relevancy of the gang evidence to issues of motive and intent clearly echoed the views it had earlier expressed at the Evidence Code section 402 hearing when it ruled the evidence was admissible to prove the underlying charges. In addition, the language the court used in expressing its ruling implies it engaged in, as suggested by the prosecutor, a type of Evidence Code section 352 balancing of prejudicial versus probative values and such an analysis presupposed the relevance of the gang evidence to the underlying charges. Consequently, we have no doubt the court continued to hold the view the gang evidence was

---

[8] The same bench officer presided over the pretrial Evidence Code section 402 hearing, the trial and the motion for new trial.

relevant to the motive and/or intent and that such an opinion played a significant role (even though the court did not so expressly state in its ruling) in the court's decision to deny the new trial motion as to the underlying charge.

At trial the prosecutor argued the motive for the shooting was to gain respect and enhance the shooter's reputation—essentially to "earn one's bones" within the gang (i.e., the "respect" motive). In our view, however, there was insufficient evidence to support the contention that this shooting was done with the intent to gain respect. On the contrary, the motive for the underlying crimes, in particular the shooting at Bacelis's house, was not apparent from the circumstances of the crime. The shooting occurred at a private birthday party for Bacelis's cousin. Although according to Deputy Gillis, Bacelis was a member of the Pierce Boys Gang, Bacelis's gang did not have any known or relevant gang rivalries. Deputy Gillis testified that gang members commit crimes to gain respect and enhance their status within the gang. He noted a gang member gains such respect if his identity (or the identity of his gang) becomes known to the victim(s), within the gang community and/or the neighborhood. Yet this shooting presented no signs of gang members' efforts in that regard—there was no evidence the shooters announced their presence or purpose—before, during or after the shooting. There was no evidence presented that any gang members had "bragged" about their involvement or created graffiti and took credit for it. In fact, at the Evidence Code section 402 hearing Deputy Gillis conceded he did not know the reason for the shooting, though he had "heard" that gang members were present at the party. There is nothing inherent in the facts of the shooting to suggest any specific gang motive.[9] In the final analysis, the only evidence to support the respect motive is the fact of Albarran's gang affiliation.

Even if we were to conclude that evidence of Albarran's gang membership and some evidence concerning gang behavior were relevant to the issue of motive and intent, other extremely inflammatory gang evidence was admitted, which had no connection to these crimes. The prosecution presented a panoply of incriminating gang evidence, which might have been tangentially relevant to the gang allegations, but had no bearing on the underlying charges. Deputy Gillis testified at length[10] about the identities of other 13 Kings members, the wide variety of crimes they had committed and the numerous contacts between the various gang members (other than Albarran)

---

[9] The facts that more than one shooter was involved and the crime occurred in a gang area in Palmdale do not demonstrate one way or another that the crime was gang motivated. (See *People v. Martinez* (2004) 116 Cal.App.4th 753, 762 [10 Cal.Rptr.3d 751] [presence of an unidentified accomplice does not demonstrate a crime is gang related where there is no evidence the accomplice is a gang member].)

[10] Deputy Gillis's testimony consumed the better part of an entire trial day (in a six-day trial) and spans 70 pages of the reporter's transcript.

and the police. He described a specific threat 13 Kings had made in their graffiti to kill police officers. The jury heard references to the Mexican Mafia both during the prosecutor's opening argument and in Deputy Gillis's testimony. All of this evidence was irrelevant to the underlying charges and obviously prejudicial. Evidence of Albarran's gang involvement, standing alone, was sufficient proof of gang motive. Evidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had little or no bearing on any other material issue relating to Albarran's guilt on the charged crimes and approached being classified as overkill.[11] While the court did admonish the jury concerning the proper use of the gang evidence, certain gang evidence admitted was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt.

We are troubled by the lack of scrutiny given to the gang evidence (and its potential for prejudice) when the court denied the new trial motion on the underlying charges. When viewed in the full context of the arguments of counsel and discussion at hearing on the new trial motion, the trial court effectively endorsed the conclusions it had reached pretrial about the relevance of the gang evidence to the issues of motive and intent. The court impliedly found that "some"[12] of the gang evidence was in fact relevant before proceeding to quasi-Evidence-Code-section-352/prejudice analysis in which it concluded the gang evidence presented did not affect the verdict in view of the strength of the other non-gang evidence. As previously addressed, however, certain of the gang evidence, i.e., threats against police, reference to the Mexican Mafia, and descriptions of other crimes committed by other gang members, was irrelevant, cumulative and presented a substantial risk of undue prejudice. The paramount function of this evidence was to show Albarran's criminal disposition—a fact emphasized in the prosecutor's closing argument when he argued: "[Albarran] is all about being a gang member day in and day out, every day, every night, despite efforts of the deputies . . . . He's all about it."

## B. *Prejudicial Error*

We turn then to the issue of prejudice. Albarran does not base his appeal solely on the argument that the trial court's ruling admitting gang evidence

---

[11] Additionally, we doubt all of the gang evidence admitted was relevant to prove the gang enhancement. In particular, the evidence concerning death threats to police and the Mexican Mafia has little, if any, bearing on the gang enhancements in this case.

[12] Because the trial court did not examine the specific types of gang evidence admitted in light of the errors asserted at the new trial hearing, this court cannot be certain what exact evidence the court was referring to when during the hearing the court indicated its view that "some" of the gang evidence was relevant to the issues of motive and intent.

violated rules of evidence and prejudiced the verdict under state law. If this were so, we would now examine whether the result of the trial would have been the same, absent the error, under the "reasonably probable" standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

 Instead, he claims that the erroneous admission of this evidence was so serious as to violate his federal constitutional rights to due process, rendering his trial fundamentally unfair. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [116 L.Ed.2d 385, 112 S.Ct. 475]; *People v. Partida* (2005) 37 Cal.4th 428, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*) ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."].)[13] To determine whether an evidentiary ruling denied defendant due process of law, "the presence or absence of a state law violation is largely beside the point" because "failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis" for granting relief on federal due process grounds. (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919–920.) If Albarran demonstrates the admission of evidence violated federal due process rights, he need not demonstrate the *Watson* standard for prejudicial error. Under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], in the case of a deprivation of federal due process, reversal is required unless the state can prove beyond a reasonable doubt that the error did not contribute to the verdict. (See *People v. Boyette* (2002) 29 Cal.4th 381, 428 [127 Cal.Rptr.2d 544, 58 P.3d 391] [*Watson* standard applies to prejudicial-error analysis for errors of state law, while beyond-a-reasonable-doubt standard of *Chapman v. California, supra*, 386 U.S. 18 applies to similar analysis for federal constitutional errors].)

To prove a deprivation of federal due process rights, Albarran must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp, supra*, 926 F.2d at p. 920, italics omitted.) "The dispositive issue is . . . whether the trial court committed an error which

---

[13] It appears Albarran did not assert a specific federal due process claim in the trial court. Nonetheless, under *Partida* his due process claim is subsumed within his Evidence Code section 352 objection, and thus has been preserved for appeal. Thus, he may argue "the asserted error in admitting the evidence over his Evidence Code section 352 objection had the additional legal consequence of violating due process." (*People v. Partida, supra*, 37 Cal.4th at p. 435.)

rendered the trial 'so "arbitrary and fundamentally unfair" that it violated federal due process.' [Citation.]" (*Reiger v. Christensen* (9th Cir. 1986) 789 F.2d 1425, 1430.)[14]

Certain gang evidence, namely the facts concerning the threat to police officers, the Mexican Mafia evidence and evidence identifying other gang members and their unrelated crimes, had no legitimate purpose in this trial. The trial court's ruling on the new trial motion in which it broadly concluded the gang evidence was admissible to prove motive and intent for the underlying charges was arbitrary and fundamentally unfair. As we have concluded elsewhere, the prosecution did not prove that this gang evidence had a bearing on the issues of intent and motive. We thus discern "no permissible inferences" that could be drawn by the jury from this evidence. (*Jammal v. Van de Kamp, supra,* 926 F.2d at p. 920, italics omitted.) From this evidence there was a real danger that the jury would improperly infer that whether or not Albarran was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished. Furthermore, this gang evidence was extremely and uniquely inflammatory,[15] such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues.[16] In our view, looking at the effect of this evidence on the trial as a whole, we believe that this prejudicial gang

[14] According to the dissent, the trial court did not err when it admitted all of the gang evidence pretrial and thereafter, and the trial court committed no prejudicial error in denying the new trial motion. Based on these premises, the dissent endeavors to analyze the issue of prejudice by offering an analogy to law governing joinder and severance, describing the question as "whether admission of the gang evidence, even though the trial court did not abuse its discretion in ruling that evidence admissible at the time of the section 402 hearing, 'actually resulted in "gross unfairness" amounting to a denial of due process.' " (Dis. opn., *post,* at p. 239.)

As we have elsewhere explained, however, we question whether (even considering the gang allegations) certain gang evidence (i.e., threats against police, reference to the Mexican Mafia) should have been excluded pretrial as irrelevant or unduly prejudicial under Evidence Code section 352. In addition, we read the trial court's ruling at the hearing on the new trial motion to have included an implicit (and erroneous) finding that at least some (unidentified) gang evidence was relevant to the issues of motive and intent for the underlying charges. Thus, in our view the reliance on an analogy from the law governing joinder and severance, which was not offered, suggested or even briefed by any of the parties, is both unnecessary and inapt.

Instead, the analysis of prejudice properly proceeds to examine whether the *erroneous admission* of gang evidence was so serious as to violate Albarran's federal constitutional rights to due process, rendering his trial fundamentally unfair under tests formulated by *Jammal* and *Reiger.*

[15] Indeed, more than one California court has recognized references to the Mexican Mafia are extremely prejudicial. (See *People v. Hisquierdo* (1975) 45 Cal.App.3d 397, 405 [119 Cal.Rptr. 378]; *People v. Ayala* (2000) 23 Cal.4th 225, 276–277 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

[16] This strength of the gang evidence served to bolster the identifications and Albarran's statement to Deputy Gillis.

evidence was " 'of such quality as necessarily prevents a fair trial.' " (*Jammal v. Van de Kamp, supra*, 926 F.2d at p. 920.)[17]

---

[17] Even were one to accept the dissent's joinder and severance analogy, and its underlying premises concerning the propriety of the court's rulings with respect to the admission of the gang evidence, the prejudice analysis turns on, as the dissent acknowledges, whether the admission of the evidence was so prejudicial as to render the defendant's trial fundamentally unfair. Thus, in the joinder and severance context, if the trial court's ruling on a motion to sever is correct at the time it was made, the appellate court must nevertheless reverse the judgment if the " 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' [Citation.]" (*People v. Mendoza* (2002) 24 Cal.4th 130, 162 [99 Cal.Rptr.2d 485, 6 P.3d 150].) "[E]rror involving misjoinder 'affects substantial rights' and requires reversal . . . if [it] results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.' " (*United States v. Lane* (1986) 474 U.S. 438, 449 [88 L.Ed.2d 814, 106 S.Ct. 725] (*Lane*), relying on *Kotteakos v. United States* (1946) 328 U.S. 750, 765, 775 [90 L.Ed. 1557, 66 S.Ct. 1239].) The issue is not whether the evidence is sufficient to support the convictions on the joined counts, independent of the evidence on other counts. " 'The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.' " (*Lane, supra*, 474 U.S. at p. 449 [106 S.Ct. 725].) In further explaining the "substantial influence analysis," the Supreme Court stated: "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." (*Kotteakos, supra*, 328 U.S. at p. 765.) Applying this "fundamental fairness" test, given the extremely inflammatory nature of certain gang evidence, we cannot say (even considering the other evidence against Albarran) that the verdict was not substantially swayed by the error. Thus, even under the severance and joinder analogy, reversal is warranted.

The dissent, however, while citing *Lane* and *Kotteakos*, does not actually use the "fundamental fairness" test derived from its joinder and severance analogy. Instead the dissent borrows the test from another entirely unrelated context, namely, the prejudicial error test applied to assess the impact of discovery and *Brady* violations (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]). (Dis. opn., *post*, pp. 239–240.) Specifically, in the discovery/*Brady* violation context a wronged defendant must convince the court that " 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." (*Strickler v. Greene* (1999) 527 U.S. 263, 289–290 [144 L.Ed.2d 286, 119 S.Ct. 1936], quoting *Kyles v. Whitley* (1995) 514 U.S. 419, 433, 434 [131 L.Ed.2d 490, 115 S.Ct. 1555] [" 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' "].)

In this formulation of the "fundamental fairness" test as derived from this case law involving discovery errors and *Brady* violations, the dissent has weighed the (non-gang) evidence against what it characterizes as the "potential" prejudicial impact of the gang evidence and concludes the independent evidence establishing guilt was so strong that no gross unfairness occurred which undermines the confidence in the verdict. (Dis. opn., *post*, at pp. 239–240.)

We cannot agree with the dissent's choice of fundamental fairness test or how the dissent applies it. A *Brady*/discovery violation is a procedural error in the trial; it concerns the failure to produce evidence which ultimately may or may not have benefited the defendant and which

■ This case presents one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair. Given the nature and amount of this gang evidence at issue, the number of witnesses who testified to Albarran's gang affiliations and the role the gang evidence played in the prosecutor's argument, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict. Consequently, the court erred in failing to grant Albarran a new trial on all of the charges.[18]

## DISPOSITION

The judgment is reversed and the matter is remanded to the superior court for further proceedings. On remand the superior court is directed to: (1) vacate its order denying appellant's motion for a new trial as to counts 1 through 5; and (2) enter a new and different order granting appellant's motion for a new trial on all charges.

Johnson, J., concurred.

---

may or may not have been even presented or even considered by the jury. Thus the likely impact of a *Brady*/discovery error on the verdict is far from certain, and extremely difficult to measure. Thus, the fundamental fairness test in the *Brady* context attempts to determine prejudice by looking at whether, without the *Brady* evidence, the defendant nonetheless received a fair trial.

In contrast, here the error concerns, not the omission or exclusion of evidence from the trial, but evidence which the jury actually heard and which was emphasized throughout the trial. Where, as here, the trial is infused with gang evidence, it is simply not possible to assess the fairness of the trial in its absence, as is the case in the *Brady* context. The gang evidence in this case was plainly and without question prejudicial to defendant. Legions of cases and other legal authorities have recognized the prejudicial effect of gang evidence upon jurors. (See, e.g., *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905 [184 Cal.Rptr. 165, 647 P.2d 569] [where a defendant is a known gang member, evidence of gang membership creates a real danger the jury will infer the defendant is guilty because of his membership standing alone]; Howarth, *Representing Black Male Innocence*, (1977) 1 J. Gender Race & Just. 97, 139 ["Gangs are a social phenomenon, in which the individual's identity is linked (often brutally) to the group. At least in theory criminal trials focus on individual culpability. [But in the case of introducing gang evidence] individual guilt or innocence [may become] hazy and faded behind the wall of group identity and group guilt"].) Indeed, because of the way in which gangs terrorize the community, the crimes they commit, and their prevalence in society the very mention of the term "gangs" strikes fear in the hearts of most. In addition, the Legislature has singled out gang-related crimes for enhanced punishment. For these reasons, in our view, the erroneous introduction of gang evidence, should be assessed under a less anemic test for fundamental fairness than the one used by the dissent.

[18] In view of our conclusion that this evidence violated federal due process protections and constituted error under *Chapman v. California, supra,* 386 U.S. 18, we need not assess whether it also constitutes reversible error under *People v. Watson, supra* 46 Cal.2d 818, 836.

**PERLUSS, P. J.,** Dissenting.—I respectfully dissent.

Adan Albarran was convicted after a jury trial of one count of attempted murder (Pen. Code, §§ 664, 187, subd. (a)), one count of shooting at an inhabited dwelling (Pen. Code, § 246) and three counts of attempted kidnapping for carjacking (Pen. Code, §§ 664, 209.5, subd. (a)). The jury also found true firearm use allegations as to several counts (Pen. Code, §§ 12022.53, subds. (b), (c), 12022.5, subd. (a)(1)) and, with respect to all counts, a special allegation the crimes had been committed for the benefit of a criminal street gang and with the specific intent to promote or assist in criminal conduct by gang members (Pen. Code, § 186.22, subd. (b)(1)(A)). The trial court granted Albarran's motion for a new trial with respect to the gang allegations, concluding the evidence was not sufficient to support the jury's true findings.[1] However, the court denied Albarran's motion for a new trial with respect to the underlying offenses, holding the admission of the gang evidence, "which the court would not describe as being overwhelming," was not so prejudicial as to deprive Albarran of a fair trial in light of the independent evidence of his guilt, including witness identifications and the incriminating statements attributed to Albarran himself.

### 1. *The Pretrial Ruling on the Admissibility of the Gang Evidence*

Although Albarran asserts the trial court abused its discretion in ruling at the pretrial Evidence Code section 402 (section 402) hearing that the People had established a sufficient foundation for the admission of the gang evidence, he does not press that claim on appeal. To the contrary, in his opening brief Albarran advises us we need not address the issue: "This Court, however, need not determine whether the trial court's pretrial ruling constituted an abuse of discretion." Instead, he advances only a single ground for reversing the trial court's denial of his new trial motion: "The extreme and highly inflammatory gang evidence that was admitted to prove the subsequently dismissed gang allegation unfairly prejudiced the defendant's trial on the underlying charges."

It seems the majority has accepted this invitation, at least as I understand its opinion, and does not hold the trial court erred in its ruling at the section 402 hearing.[2] I agree.

---

[1] Following the trial court's grant of a new trial as to the gang enhancement allegations, the allegations were dismissed.

[2] In a footnote the majority does "question whether (even considering the gang allegations) certain gang evidence (i.e., threats against police, reference to the Mexican Mafia) should have been excluded pretrial as irrelevant or unduly prejudicial under Evidence Code section 352." (Maj. opn., *ante,* at p. 230, fn. 14.) But it nowhere suggests the trial court erred in concluding at the section 402 hearing that the People had established a sufficient foundation to attempt to

Before trial Albarran moved to exclude all gang evidence, arguing, although there was (undisputed) evidence Albarran was a member of the 13 Kings gang, there was no evidence the crimes charged were gang related. In particular, Albarran asserted there would be no evidence at trial the perpetrators called out a gang name or made gang signs during the shooting or its aftermath. The court ordered a section 402 hearing based on Albarran's motion and argument. At that hearing Los Angeles County Deputy Sheriff Robert Gillis, a gang expert who had worked for more than three years in the Palmdale area where the crime occurred, testified 13 Kings (also known as Palmas) is the most active gang in the area and the gang frequently engages in the crimes of carjacking and drive-up shootings.

Deputy Gillis expressed his opinion Albarran is an active member of 13 Kings. According to Gillis, he has had many direct contacts with Albarran, who admitted to him he was a gang member in one of their face-to-face conversations; Albarran's gang moniker is "Flaco"; he has a "13" tattooed on one shoulder and a "K" tattooed on the other shoulder; and Albarran's residence was known to be a 13 Kings gathering place. Gillis also testified in his opinion the March 14, 2004 shooting "was specifically intended to promote, further or assist a criminal street gang." Gillis noted the person whose house was the target of the gunfire was a member of the Pierce Boys gang (although he conceded he was not aware of any specific rivalry between that gang and 13 Kings) and explained it was an issue of respect: "You'll get rival gang members that go to the same party—and it's a respect issue, where if they show their muscle, who they are, what they do, maybe not even necessarily say, 'we're 13K,' but people on the street will know that they're 13K or Palmas, which is what they were often claiming then. They don't necessarily need to claim it for people to know who they are." Finally, Gillis testified (albeit without any factual foundation) the second shooter with Albarran was also a member of 13 Kings and, in his experience, when gang members carry out a shooting, they typically do so with other gang members.

prove the criminal street gang enhancements under Penal Code section 186.22, subdivision (b)(1)(A). To do so, the People had to present evidence at trial that each of the offenses was committed for the benefit of, at the direction of or in association with a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang members. To establish 13 Kings is a "criminal street gang," the People had to prove, among other things, it has as one of its primary activities the commission of one or more of the crimes enumerated in section 186.22, subdivision (e), and has engaged in a "pattern of criminal gang activity" by committing two or more " 'predicate offenses.' " (§ 186.22, subds. (e), (f); *People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Accordingly, evidence of Albarran's membership in 13 Kings, as well as evidence 13 Kings had committed various violent crimes and the gang expert's opinion that shootings and other acts of intimidation were committed by gang members to promote themselves, were all relevant to proving the elements of the gang enhancements. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048 [16 Cal.Rptr.3d 880, 94 P.3d 1080] ["to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs"].)

Following Deputy Gillis's testimony Albarran asked the court to dismiss the gang enhancement allegations, and to exclude the gang evidence. The court denied the motion, recognizing that gang evidence necessarily creates some risk of undue prejudice, but concluding in this instance, "based on the testimony of Deputy Gillis that there is a sufficient foundation that has been presented that does intertwine, not only the charges but also the gang allegation. All of this comes together in terms of reasoning or the intent or the motive behind the shooting. . . . The court does not believe that the gang evidence as a whole—that the probative value is substantially outweighed by the risk of undue prejudice to the defendant."

Based on this record, we could not hold the trial court exercised its discretion to allow the gang evidence at trial, including evidence that may not have been directly relevant to Albarran's motive or intent but was highly probative on the gang enhancement allegations, in " ' "an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. Ochoa* (2001) 26 Cal.4th 398, 437–438 [110 Cal.Rptr.2d 324, 28 P.3d 78]; see *People v. Williams* (1997) 16 Cal.4th 153, 193, 196 [66 Cal.Rptr.2d 123, 940 P.2d 710] ["we have without question permitted police to provide expert testimony regarding gangs"].) The trial court properly balanced the probative value of that evidence with respect to both the underlying offenses and the gang enhancement allegations against the potential for prejudice and determined the gang expert testimony should be permitted.[3]

### 2. *The Majority's Misperception of the Trial Court's Ruling Denying a New Trial on the Underlying Charges*

If the gang evidence was not improperly admitted at trial, at least when viewed from the trial court's *ex ante* perspective, on what ground does the majority hold the court erred in denying Albarran's new trial motion? The majority concludes the trial court failed to give sufficient scrutiny to the gang evidence and, in particular, its potential for prejudice and, by improperly concluding much of that evidence was admissible on the underlying charges without regard to the gang enhancements, rendered Albarran's trial "so arbitrary and fundamentally unfair" that it violated due process. To reach this result, the majority proceeds in three steps, each of which is problematic.

First, it engages in a lengthy analysis demonstrating that much of the gang evidence relating to the various criminal activities of the 13 Kings, which

---

[3] At trial the People presented no evidence to support Deputy Gillis's assertion the second shooter was a member of 13 Kings. That failure was a primary factor in the trial court's posttrial conclusion the evidence was legally insufficient to support the jury's true findings on the gang enhancement allegations.

without doubt had a high potential for prejudice, would not have been admissible over an Evidence Code section 352 objection if there had been no gang enhancement allegations in the information and the only basis for admitting the evidence were to prove Albarran's motive or intent in connection with the attempted murder and other substantive crimes charged. I do not disagree with the analysis itself, but believe it is essentially irrelevant to the issue before us because there were, in fact, special gang enhancement allegations tried to the jury. As discussed, the trial court did not err in ruling *before* trial that the gang evidence proffered by the People was admissible under those circumstances.[4] Instead, as indicated below, I believe the proper analysis focuses not on comparing the potential for undue prejudice from the admission of the gang evidence to its probative value with respect to the underlying charges, but rather on evaluating whether that evidence, even if properly admitted at trial, was nonetheless so prejudicial when viewed in light of the entire record that Albarran's trial was fundamentally unfair.

Second, although qualifying its conclusion by twice noting the trial court "did not expressly so state" (maj. opn., *ante*, at p. 226), the majority insists the court necessarily, albeit "impliedly," found the gang evidence relevant to the issues of motive and intent before concluding, based on what it describes as a "quasi-Evidence-Code-section-352/prejudice analysis" (maj. opn., *ante*, at p. 228), that the new trial motion should be denied because the gang evidence was not unduly prejudicial: "[T]he language the court used in expressing its ruling implies it engaged in, as suggested by the prosecutor, a type of Evidence Code section 352 balancing of prejudice versus probative values and such an analysis presupposed the relevance of the gang evidence to the underlying charges. Consequently, we have no doubt the court continued to hold the view the gang evidence was relevant to the motive and/or intent and that such an opinion played a significant role (even though the court did not so expressly state in its ruling) in the court's decision to deny the new trial motion as to the underlying charge." (Maj. opn., *ante*, at pp. 226–227.)

My disagreement with this second step rests on the fact the trial court did not engage in the analysis or make the ruling the majority attributes to it. To be sure, in connection with the pretrial motion to exclude all gang-related evidence, the trial court stated the gang enhancement allegations and underlying charges "intertwine," and then found, "All of this comes together in terms

---

[4] The majority's assertion that much of the gang evidence "had no legitimate purpose in this trial" (maj. opn., *ante*, at p. 230), if intended to suggest it was not properly admitted at the trial that actually took place, in my view, is simply incorrect because that evidence was necessary if the People were to prove the gang enhancement allegations. (See fn. 2, above.) If it is intended as an evaluation of a hypothetical trial in which there were no gang allegations, it seems to me to be beside the point.

of reasoning or the intent or the motive behind the shooting." But even if this is properly construed as a pretrial ruling that all of the gang evidence was relevant to the issues of motive and intent without regard to the presence of the gang allegations (which I do not believe it is), the trial court made no such statement, let alone a ruling, in denying the new trial motion. To the contrary, in a colloquy with defense counsel during argument on the new trial motion, the court observed that "some of the gang evidence [could] have come in even without the 186.22 allegation," never suggesting that all or even most of the evidence would have been admissible in the absence of the gang enhancement allegations.[5] That issue of limited admissibility, however, did not constitute any part of the trial court's rationale for denying the new trial motion on the underlying charges. Rather, the court concluded the introduction of the gang evidence "would not have affected the verdict one way or the other" in light of the independent strength of the identifications of Albarran and his own statement implicating himself in the crimes and, therefore, Albarran was not denied a fair trial.[6]

Finally, based on its apparent misunderstanding of the trial court's ruling and relying on two decisions from the United States Court of Appeals for the Ninth Circuit, the majority holds, " 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (Maj. opn., *ante*, at pp. 229–230.) Applying that standard, the majority then decides, "The trial court's ruling on the new trial motion in which it broadly concluded the gang evidence was admissible to prove motive and intent for the underlying charges was arbitrary and fundamentally unfair." (Maj. opn., *ante*, at p. 230.) Because the premise for this conclusion is fundamentally flawed, I cannot accept the conclusion itself.

---

[5] Albarran's appellate counsel confirms this interpretation of the trial court's comments during the hearing on the new trial motion: "The trial court itself implicitly acknowledged that not all of the gang evidence would have [been] admissible at a trial on the underlying charges. It is true that the court did express its view that *perhaps some* of the evidence would have been admissible absent the gang allegation, to prove motive or intent." (Fns. & record citation omitted, italics added.)

[6] The trial court fully explained the basis for its decision, obviating any need to reconstruct by implication the court's rationale for denying the motion: "The court did consider the arguments raised that the sheer introduction of the gang evidence in and of itself, in essence, poisoned the well and was too prejudicial and inflammatory. In its review of the evidence, the court considered the independent strength of the evidence, including the identifications in this case [and the] statements attributed to the defendant, in determining whether or not the gang evidence that did come in, which the court would not describe as being overwhelming, but whether or not that gang evidence in and of itself, if it did come in, would affect the jury's verdict as to the remaining charges. The court's opinion is that it would not have affected the verdict one way or the other."

### 3. *Albarran's Trial Was Not Fundamentally Unfair*

If the ruling identified by the majority as "arbitrary and fundamentally unfair" was never made, is there any other basis for reversing the trial court's decision to deny Albarran's motion for a new trial? Although there appear to be no published cases directly considering the issue before us—how to evaluate the prejudicial impact of gang evidence properly admitted at trial only because special gang allegations were also included in the information when the evidence thereafter presented at trial is legally insufficient to support a true finding as to those allegations[7]—a helpful analogy can be found in the law governing joinder and severance.[8]

An appellate court reviews the trial court's denial of a pretrial severance motion based on the facts known and the showing made at the time of the motion itself. (*People v. Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480]; *People v. Johnson* (1988) 47 Cal.3d 576, 588 [253 Cal.Rptr. 710, 764 P.2d 1087].) However, even if the trial court did not abuse its discretion in denying the motion to sever based upon the showing made at the time of the motion, "there remains the question whether, despite the correctness of the trial court's ruling, a gross unfairness has occurred from the joinder such as to deprive the defendant of a fair trial or due process of law." (*Johnson*, at p. 590; accord, *People v. Bean* (1988) 46 Cal.3d 919, 940 [251 Cal.Rptr. 467, 760 P.2d 996].) In considering that question, the reviewing court examines the impact at trial of the joinder by looking at the

---

[7] Putting it somewhat differently, in my view the question is not "whether the *erroneous admission* of gang evidence was so serious as to violate Albarran's federal constitutional rights to due process," as the majority phrases the issue on appeal (maj. opn., *ante*, at p. 230, fn. 14, original italics), but whether, notwithstanding the proper admission of the gang evidence at the time, viewed in retrospect that evidence was so inflammatory it made Albarran's trial fundamentally unfair—that is, its admission at trial undermines our confidence in the integrity of the verdict. To be sure, both forms of the question require us ultimately to decide if Albarran received a fair trial. But the question as posed by the majority focuses primarily on the nature of the gang evidence itself (both its probative value and its prejudicial impact), which is understandable since the majority assumes such an analysis formed the basis for the trial court's denial of the new trial motion. I believe, in contrast, we should examine the independent evidence of Albarran's guilt, as well as the potential prejudice from the gang evidence, and determine, viewing the record as a whole, whether we remain confident the jury reached the correct result for the proper reason.

[8] In *People v. Hernandez, supra*, 33 Cal.4th at page 1050, the Supreme Court analyzed the scope of the trial court's discretion to deny bifurcation of the trial of a gang enhancement from trial of the charged offense when some of the evidence to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—"for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged." In this somewhat related context, the Supreme Court found reference to the well-developed law of severance useful, even if "[t]he analogy . . . is not perfect." (*Hernandez*, at p. 1050.)

evidence actually introduced at trial—the independent evidence of the defendant's guilt, as well as the spillover effect of the evidence from the joined charge. (*People v. Turner* (1984) 37 Cal.3d 302, 313 [208 Cal.Rptr. 196, 690 P.2d 669]; *Bean*, at p. 940.)

Applying that analytic structure to the case at bar, the question is whether admission of the gang evidence, even though the trial court did not abuse its discretion in ruling that evidence admissible at the time of the section 402 hearing, "actually resulted in 'gross unfairness' amounting to a denial of due process." If it did, the trial court erred in denying Albarran's new trial motion. (See, e.g., *People v. Drake* (1992) 6 Cal.App.4th 92, 97–98 [7 Cal.Rptr.2d 790] [trial court's constitutional duty to ensure defendants be accorded due process of law provides it with authority to grant new trial when defendant "did not receive a fair trial," even though cause of unfairness is not expressly recognized as ground for granting new trial under Pen. Code, § 1181]; *People v. Fosselman* (1983) 33 Cal.3d 572, 582 [189 Cal.Rptr. 855, 659 P.2d 1144].) The standard, then, is whether the gang evidence presented was so inflammatory when viewed in light of the record as a whole that it denied Albarran a fair trial: "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182]; see *People v. Partida* (2005) 37 Cal.4th 428, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765] ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."]; see generally *Lisenba v. California* (1941) 314 U.S. 219, 228–229 [86 L.Ed. 166, 62 S.Ct. 280] ["We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process."].)

Although there is no single test for such "fundamental unfairness," in a variety of contexts the United States and California Supreme Courts have stated, beyond a violation of the specific guarantees enumerated in the Bill of Rights, only acts that "undermine[] confidence in the outcome of the trial" rise to the level of due process violations. (*United States v. Bagley* (1985) 473 U.S. 667, 678 [87 L.Ed.2d 481, 105 S.Ct. 3375]; see, e.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 474 [79 Cal.Rptr.2d 408, 966 P.2d 442] ["[n]ot every discovery violation is a due process violation—only those that undermine confidence in the outcome"]; *Kyles v. Whitley* (1995) 514 U.S. 419, 434 [131 L.Ed.2d 490, 115 S.Ct. 1555] ["The question is not whether the defendant would more likely than not have received a different verdict with

the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"]; see also *Kotteakos v. United States* (1946) 328 U.S. 750, 764 [90 L.Ed. 1557, 66 S.Ct. 1239] ["If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . ."]; *United States v. Lane* (1986) 474 U.S. 438, 449 [88 L.Ed.2d 814, 106 S.Ct. 725] ["an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict' "].) Utilizing that standard, I respectfully disagree with the majority's ultimate conclusion Albarran's trial on the underlying charges was "fundamentally unfair."

Notwithstanding the potentially prejudicial nature of the gang evidence introduced at trial, the evidence supporting the jury's guilty verdicts, which included three positive eyewitness identifications and Albarran's own highly damaging admission of involvement in the shooting, in my view, is compelling. Michael Bacelis, the owner of the home at which the first shots were fired, ran to the front of his house after hearing gunfire and saw two Latino males holding guns (one a shotgun, the second a handgun) several houses away. (Bacelis's house and garage sustained shotgun and handgun damage from the assault.) The two young men, both with shaved heads, continued to shoot toward Bacelis's home. Once the men stopped firing and began to run away, Bacelis gave chase in his sport utility vehicle (SUV). After turning a corner, Bacelis saw the young men, still holding their guns, jump into a car at the end of the street.

The car, which was facing Bacelis, initially appeared to be backing up. After it came to a stop, the two men got in. The car then proceeded forward, turning left in front of Bacelis. Believing the car was a getaway vehicle for the shooters, Bacelis crashed his SUV into it. Two young men jumped out and fled.

Bacelis could not identify the two shooters. However, the three young women who were in the car into which Bacelis crashed—Lizette Arvizu, the driver of the car; her cousin, Andrea Arvizu, a neighbor of Bacelis; and their friend Monique Gonzalez—each separately identified Albarran as one of the two men who had entered the car that evening. Each of the young women also stated Albarran carried a small handgun. Given Bacelis's testimony that he saw the two shooters climb into Arvizu's car, those identifications of Albarran are devastating, notwithstanding some inconsistencies between the young women's trial testimony and information they provided the police that evening.

Moreover, when Albarran was taken into custody on April 30, 2004, six weeks after the incident, he clearly admitted his involvement in the shooting and acknowledged entering Arvizu's car, thus confirming the young women's identification of him. According to Deputy Gillis, who arrested Albarran, Albarran told him, "Man, this is messed up. We jumped into that bitch's car when we got in that shooting and she drove us out of the area." (Both at trial and on appeal counsel for Albarran have attempted to make much of the fact Lizette Arvizu did not, in fact, drive Albarran or his confederate out of the area because Bacelis crashed his SUV into her car. Whatever value that point may have had before a jury, it does not undermine Gillis's credibility in reporting what Albarran said at the time of his arrest, nor does it weaken the significance of Albarran's admission.)

Albarran did not testify, but presented an alibi defense through several witnesses (his mother, an uncle, a cousin and a family friend). In finding Albarran guilty, the jury plainly credited the identification testimony of the three young women and disbelieved Albarran's alibi witnesses, although there was no suggestion any of them was a gang member.

Finally, although the evidence of criminal activity by the 13 Kings unrelated to the shooting and attempted kidnapping for carjacking on March 14, 2004, summarized at great length by the majority, certainly had a potential to prejudice the jury against Albarran, the court properly instructed the jury on several occasions they were not permitted to consider the gang evidence to prove Albarran "is a person of bad character or that he has a disposition to commit crimes." "[E]vidence has been introduced for the purpose of showing criminal street gang activity and criminal acts by gang members, other than the crimes that are charged in this case for which the defendant is on trial. This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining, if it tends to show, that the crimes charged in this case were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct for gang members. . . . You are not permitted to consider such evidence for any other purpose." It is, of course, presumed the jury followed the court's instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 [2 Cal.Rptr.3d 186, 72 P.3d 1166] ["we and others have described the presumption that jurors understand and follow instructions as '[t]he crucial assumption underlying our constitutional system of trial by jury.' [Citations.]"]; *People v. Holt* (1997) 15 Cal.4th 619, 662 [63 Cal.Rptr.2d 782, 937 P.2d 213] ["Jurors are presumed to understand and follow the court's instructions."].)

In sum, considering the potential prejudicial impact of the gang-related evidence (with its related limiting instructions) against the great weight of the independent evidence of Albarran's guilt on the underlying charges, I cannot conclude a gross unfairness has occurred that undermines my confidence in the jury's verdict. Like the trial court, I believe Albarran received a fundamentally fair trial. Accordingly, I would affirm the judgment.