Filed 6/4/14  P. v. Studer CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRAVIS STUDER,<br><br>    Defendant and Appellant. | F066340<br><br>(Super. Ct. No. TF006044A)<br><br><br>**OPINION** |

-ooOoo-

## THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  Cory Woodward, Judge.

James Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Leanne LeMon and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Levy, Acting P.J., Peña, J. and Sarkisian, J.†

†      Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Appellant, Travis Studer, was charged with committing the following offenses on July 12, 2012:[1] attempted first degree robbery (Pen. Code, §§ 212.5 subd. (a), 664),[2] first degree burglary (§§ 459, 460, subd. (a)), and assault with a deadly weapon (§ 245, subd. (a)(1)). It was also alleged that in committing the count 1 offense, appellant personally inflicted great bodily injury (§ 12022.7, subd. (a)). A jury convicted appellant on counts 1 and 2, found the enhancement allegation true, and acquitted appellant on count 3. The court imposed a prison term of five years.

On appeal, appellant contends the court erred prejudicially in admitting evidence that the victim's house was burglarized on July 11. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Facts - Prosecution Case*

In July 2012, Roberto Ruiz owned a house and was in the process of selling it and moving out.[3] On July 11, when appellant was not at the house, someone had entered the garage attached to the house and stolen a generator and some batteries located in the garage that were part of the solar-powered electrical system of the house.

Because of the burglary that had occurred earlier that day, Ruiz was staying overnight at the house on the night of July 11-12, along with his nephew, Joel Gonzalez. Because of the theft of the generator and batteries, the house had no electricity.

Gonzalez testified to the following: At some point "in the middle of the night," he "heard a door smash." He went to the window and saw, parked in the driveway, a station wagon "that didn't belong [on] the property." He went to the room where Ruiz was sleeping and asked his uncle if he was expecting anyone.

---

[1]    All references to dates of events are to dates in 2012.

[2]    All statutory references are to the Penal Code unless otherwise indicated.

[3]    Except as otherwise indicated, our factual summary is taken from Ruiz's testimony.

Ruiz testified that he woke when Gonzalez entered the room and told him to get up because "'a car drove in.'" Ruiz "sent [Gonzalez] outside," opened the door that connected the kitchen and the garage, entered the garage, and saw appellant standing in front of the "solar boxes." Appellant was holding a "drill" in his hand.**4** Ruiz was carrying a flashlight but he did not have a "weapon."

Ruiz yelled at appellant, "'What are you doing here?'" At that point, appellant "came at" Ruiz and the two fought. Appellant hit Ruiz one or two times in the head with the drill and Ruiz hit appellant with the flashlight. Appellant struck Ruiz first. There was a hammer in the garage, and at some point appellant "had it in his hand." Ruiz was able to take the hammer from appellant.

Gonzalez testified to the following: After he woke Ruiz and Ruiz went to the garage, Gonzalez remained in the house. When Gonzalez heard Ruiz "screaming for help," he picked up a shotgun that was kept in the house and went into the garage, where he saw appellant hitting Ruiz in the head with an "object" he could not identify. Ruiz was saying, "'He is going to kill me. Just shoot him.'" Gonzalez fired a shot as a warning, and when appellant continued hitting Ruiz and Ruiz "moved to the side," Gonzalez fired a second shot, aiming at appellant's shins. At that point appellant "went outside." Gonzalez followed. He saw appellant's hand move in the area of his waist and, thinking that appellant might be "pulling a gun," Gonzalez fired a third shot at appellant's right leg. At that point, both appellant and Ruiz were calling for help, so Gonzalez called 911. He then went into the garage to look for Ruiz.

Ruiz testified that when appellant "started hitting [Ruiz] in the head," Ruiz "yelled out for [Gonzalez]," and Gonzalez "came to the garage" and "fired at" appellant.

---

**4** Appellant testified with the aid of a Spanish-language interpreter. The transcript indicates that initially Ruiz identified the tool appellant was holding as, "[l]ike a screwdriver to remove the screws," and Ruiz referred to the tool several times thereafter as a screwdriver. The interpreter later indicated that Ruiz had testified the tool was a drill and that the interpreter had made a translation mistake.

Appellant then stopped hitting Ruiz, and Gonzalez fired another shot. Appellant then ran outside. At that point, Ruiz ran to the end of the driveway to open the gate for the police, "because we had already called the police." On his way back to the house, Ruiz saw the station wagon drive off.

Kern County Deputy Sheriff Roy Haislip testified to the following: Upon arriving at the house on July 12, he made contact with Ruiz, who was bleeding from his face and head, and had "a severe cut to the side of his face." Ruiz led Haislip to the garage, where the deputy saw, on the floor directly beneath the "solar system control panel" on the wall, a power drill, a power screwdriver, and a tool case. Ruiz told Haislip he had "never seen [these items] before." Haislip also found a hammer and a broken 18-volt Craftsman flashlight on the floor in the garage. The flashlight "appeared to be the weapon that struck [Ruiz]."

Kern County Deputy Sheriff Stephen Wells testified to the following: At approximately 7:00 a.m., on July 12, he was dispatched to Kern Medical Center, where, in one of the emergency rooms, he made contact with appellant. Wells observed that appellant had suffered a gunshot wound to his right thigh and what appeared to be a broken arm. Wells conducted a tape-recorded interview of appellant. The tape was played for the jury and a transcript of the recording indicates appellant stated the following: "[A] couple of Mexican gentlemen" shot him because he was "trespassing on their property." He had gone there "[l]ooking for trouble." He intended to "steal stuff." They "grabbed ahold" of appellant. Appellant had brought an 18-volt Craftsman flashlight with him and at some point he "swung back with [it] and it fell out of [his] hand." Appellant "was trying to get away from them, and [the man was] hitting [him] with a flashlight[,] … at which point [appellant] grabbed a hold of a hammer" and he and the other man "wrestled for [it]." As appellant was "trying to get away," "the second guy came in and shot [appellant]." When asked what he was "trying to steal," appellant answered, "I was trying to get a hold of a charging system for … a solar system."

4

*Facts - Defense Case*

Appellant testified he had heard about a house that was "in escrow" and was "empty," so "real early in the morning" on July 12, he drove there "to see … if anything was left."[5] He was "looking for trouble." He brought with him a flashlight and a battery-powered drill.

He opened the large roll-up garage door, entered, closed the door behind him and saw, on the wall, some "solar control panels." However, at that point he discovered his drill was inoperative and decided to leave. He turned off his flashlight and "started for the back door of the garage," at which point he saw a man holding a flashlight enter the garage through the door that connected the garage to the house. The light blinded appellant and he "froze." Appellant and the other man "met" at a spot between the door to the house and a door to the outside, and the man grabbed appellant's left arm and "started to hit [appellant]" with the flashlight. Appellant hit him back with his flashlight. The two men "wrestl[ed]" and both dropped their flashlights, at which point another man entered the garage. Appellant, who was "trying to get out the door," fell backwards. As he did so, he "saw a flash and heard a loud bang." He found he could not control his right arm.

Appellant, who soon realized he was shot, exited the garage through the "back door," and as he stood with his hands in the air and said "'I'm done,'" and "'I give up,'" he was "shot again in the thigh." Thinking that "they were trying to kill [him]," appellant moved toward his car, at which point he was shot a third time, in both calves, with birdshot.

Appellant, lying on the ground, implored the shooter to shoot again and "'put [him] out of [his] misery.'" One of the men—either Ruiz or Gonzalez, appellant did not

---

[5] The "Defense Case" portion of our factual statement is taken from appellant's testimony.

know which—approached him, "chanted something at [appellant] in Spanish … and then disappeared." Appellant then "managed to scoot over to [his car]," get in and drive off.

As a result of being shot on July 12, appellant lost two fingers and half of a thumb, and he suffered a broken elbow and gunshot wounds to his thigh and calves.

### *Procedural Background*

Prior to trial, appellant moved to exclude evidence that the house was burglarized on July 11, on the grounds, as stated in his written motion that such evidence was irrelevant, "more prejudicial than probative," and its admission would violate appellant's rights to a fair trial and due process of law, under the Sixth and Fourteenth Amendments to the United States Constitution.

At the hearing on the motion, defense counsel argued: "I think that the jurors will come to the logical conclusion or what they believe to be a logical conclusion, that [appellant] also burglarized the same residence the day before. And that the person that burglarized the night before knew that the house was vacant and, therefore, the person [who] knew that the house was vacant went back the next day to obtain some more stolen property."

The prosecutor responded that the evidence "would be … offered to put into perspective the conduct of the victim and the witness in this case, why they were on high alert, the fact that their house had been burglarized the day before."

The court asked defense counsel if "there [was] any issue as to the identity of the person committing the [charged] crimes." Counsel responded identity was "still an issue" because "it was in the dark in the garage, according to reports," but counsel conceded that "the fact that … two and a half of his digits were blown off by one of the victims … makes it difficult … to challenge identity."

The court ruled as follows:

> "THE COURT: The Court is trying to determine what the prejudicial impact would be.

6

"Assuming that the jurors discuss the fact that [appellant] was the person there the night before, then the danger would be the conclusion that he was the person who committed the burglary the second time. That's what I am trying to determine if there is some real prejudicial impact.

"It doesn't appear to the Court that it would be; so the Court would certainly find it probative that the victims would be on a status of high alert based upon the burglary the night before.

"And I do not find that the prejudicial impact is greater than the probative value; so it would be allowed."

## DISCUSSION

Appellant contends the court committed prejudicial error in admitting evidence of the July 11 burglary. We assume without deciding that, as appellant suggests, the challenged evidence was irrelevant, and therefore inadmissible under Evidence Code sections 210 and 350,[6] and that even if it had some degree of relevance, its probative value was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, and therefore it was inadmissible under Evidence Code section 352.[7] We turn now to the question of whether such error requires reversal.

The challenged evidence was prejudicial, appellant argues, because it "invite[d] the jury to speculate that appellant had committed the crime on July 11." Appellant invokes the principle that "[u]ncharged acts evidence carries great danger that the jury will conclude the defendant has a criminal disposition, and thus probably committed the presently charged offense."

---

[6] Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Evidence Code section 350 provides: "No evidence is admissible except relevant evidence."

[7] Evidence Code section 352 provides, in relevant part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice …."

We note first that there was no testimony that appellant committed the July 11 burglary and the prosecutor did not argue that such an inference could be drawn from the evidence presented. However, even assuming that the jury drew the inference that appellant burglarized the house the day prior to the day of the offenses charged in the instant case, any error in admitting evidence of the July 11 burglary was harmless.

First, there was no dispute appellant entered the garage attached to the house; Deputy Wells testified appellant stated he went to the house with the intention of stealing "stuff"; and appellant testified to essentially the same thing. Thus, the jury heard compelling evidence, in the form of Deputy Wells's testimony of appellant's statements and appellant's own testimony, that appellant entered the garage attached to the house with the intent to steal property located within, and thus that he committed the instant burglary. (See § 459 [burglary consists of entry into, inter alia, any "house," "with intent to commit grand or petit larceny"].) Therefore, to the extent the evidence of the July 11 burglary showed appellant had a propensity to commit burglary and other criminal acts, the overwhelming and properly admitted evidence that appellant burglarized the garage the next day showed exactly the same thing. The challenged evidence added virtually nothing to the prosecution case. And because the purported uncharged act evidence and the evidence of the July 12 burglary related to the same kind of act—a burglary—the former evidence was "no stronger and no more inflammatory than the testimony concerning the charged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

"[S]tate law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).) On this record, it is not reasonably probable that the verdict would have been more favorable to appellant had the evidence of the July 11 burglary been excluded.

Appellant argues to the contrary. Specifically, he argues the jury's acquittal of appellant on the count 3 charge of assaulting Ruiz with a deadly weapon shows that "[i]n effect, the jury rejected the evidence of Mr. Ruiz as to who started the fight between appellant and Ruiz, and effectively … believed appellant that it was Ruiz who attacked him first, and not the other way around." Having rejected Ruiz's testimony, appellant argues further, appellant's conviction on counts 1 and 2 can only be explained by the evidence of the July 11 burglary, which, appellant asserts, led the jury to conclude appellant had a propensity to commit criminal acts. We disagree.

During deliberations, the jury sent the court the following written questions: "Can the jury include [appellant's] flashlight as a deadly weapon? Is the drill considered part of the flashlight? Are we required not to use the flashlight as a deadly weapon? Can the flashlight receive consideration as the deadly weapon? Are we only limited to the hammer and drill as the use of a deadly weapon? Main question[:] Can we include the flashlight as a weapon used?" A short time later, the jury sent the court the following: "*We agree there was an assault with a deadly weapon.* If we can't agree on what the weapon was (hammer, drill), is the charge dismissed?" (Italics added.)

Later, the court summarized on the record its responses to the jury: "[The jury] was asking some specific questions about the flashlight being used as a deadly weapon, whether that might serve as the basis for Count 3. And that was responded to. I indicated that it could not be the basis of a conviction on Count 3, but could be considered for other related issues such as self-defense and the verdict on the other two counts."

It is apparent from the foregoing that the jury believed Ruiz's account of the fight with appellant, and that the acquittal on the count 3 assault was based not on the prosecution's failure to prove appellant assaulted Ruiz, but on the jury's conclusion that appellant did not commit that assault with a deadly weapon.

Finally, appellant argues that the admission of the evidence of the July 11 burglary violated his due process rights. There is no merit to this contention.

9

"[T]he admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair." (*Partida*, *supra*, 37 Cal.4th at p. 436.) "'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is ... whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230, fn. omitted.)

Even assuming there were no permissible inferences the jury could draw from the challenged evidence, the admission of the evidence of the July 11 burglary did not violate due process. From our conclusion that an error in admitting the challenged evidence was harmless under state law standards, it follows that admission of this evidence did not render the trial fundamentally unfair.

## DISPOSITION

The judgment is affirmed.