Filed 5/26/15  P. v. McFadden CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDDIE BRODNEY McFADDEN,<br><br>    Defendant and Appellant. | B255327<br><br>(Los Angeles County<br>Super. Ct. No. GA089231) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Stanley Blumenfeld, Jr., Judge.  Affirmed.

        Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Eddie McFadden of home invasion robbery in concert (Pen. Code, §§ 211, 213, subd.(a)(1)(A);[1] counts 1-3), elder abuse (§ 368, subd. (b)(1); count 4), assault with a firearm (§ 245, subd. (a)(2); counts 5-7), uttering criminal threats (§ 422, subd. (a); counts 8-9), and unlawfully possessing a firearm (§ 29805; count 10). The jury found that defendant personally used a firearm as to counts 1 through 3 (§§ 12022.53, subds. (b) & (e)(1)), count 5, and counts 7 through 9 (§ 12022.5, subd. (a)). The jury further found that counts 1 through 9 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)). The trial court sentenced defendant to an aggregate state prison term of 31 years to life.

On appeal, defendant contends that the trial court prejudicially erred in failing to bifurcate gang enhancement allegations and by allowing evidence that defendant's father was a gang member. We affirm.

## FACTS

### Prosecution

On the night of March 12, 2013, 89-year-old Hazel Walker, her daughter, Ernestine Walker, and her son-in-law, John Zadnick, were at their home in Pasadena. John and Ernestine were watching television, while Hazel had gone to bed.[2]

Around 11:00, John, who is only partially sighted and relies on corrective glasses, heard a noise in the house and noticed a male intruder. Ernestine saw the intruder point a handgun at her husband. The intruder then pointed the gun at her and told her not to move. He ordered John to lie face down on the ground and Ernestine to lie on top of him.

The assailant eventually told Ernestine to go to Hazel's bedroom. In the bedroom, she saw two additional male intruders, holding Hazel at gunpoint. The first assailant wore a hood that kept slipping down, while the other two had masks on their faces.

---

[1]    All further statutory references are to the Penal Code unless stated otherwise.

[2]    To avoid confusion, we refer to Hazel, Ernestine, and John by their first names.

The man who seemed to be the leader of the group looked to be around six feet one inch tall and had broad shoulders. Ernestine could see his "cold, menacing" eyes through the holes cut into his mask. The man—whom Ernestine later identified as defendant, from photographs, at a hearing in this matter, and at trial—kept saying, "Where's the cash?" Defendant pointed the gun at Hazel, then Ernestine, and said he had killed 10 people in the past month. He held his gun to Ernestine's head and squeezed her throat with his other hand. Defendant wore black gloves with a strip of white across the top.

The intruders ransacked the home looking for cash and valuables. Eventually, the assailants found an envelope containing a stack of $100 bills. They also grabbed a case of jewelry.

Ernestine tried to negotiate with the intruders to get them to leave the house. She told defendant that she would go the bank in the morning and withdraw $10,000 for him. Defendant demanded her cell phone number and, as she gave it to him, he entered it into a white cell phone. They agreed to meet the next morning at 11:00 a.m., and the assailants left.

Defendant called Ernestine the next morning and asked whether she was still intending to withdraw money for him. She replied that she was. Defendant called a second time asking her whether she would get the money soon and whether police were involved. She assured him that she had not contacted the police.

Ernestine went to her bank and passed a note to teller stating that she was "under duress." The teller left the counter and Ernestine stood there, waiting. Thirty to forty minutes later, the police arrived. Detective David Duran met with Ernestine. Ernestine subsequently received two phone calls from defendant, which she took on speakerphone, allowing the police to listen to and record the calls. Defendant asked her if she had the money and told her where to deliver it.

After Ernestine received the calls from defendant, the police obtained an emergency search warrant for her phone records and were able to recover the phone number used to place the calls to her. Meanwhile, John discovered that a voicemail

3

message was inadvertently left on Ernestine's cell phone by defendant while he saved her number to his phone during the robbery. Detective Duran listened to the saved voicemail and noted that the voice sounded like the one he heard on speakerphone.

On the night of March 14, 2013, Detective Duran participated in the service of a search warrant at an apartment in Arcadia. Defendant was the only person found at the apartment. The police recovered a white iPhone that was cracked on both sides. Its phone number matched the number used to make calls to Ernestine. The phone contained a text message that read, "Good morning Eddie Brodney McFadden. I love you daddy and I." Another message read, "Eddie, be honest."

Jewelry was recovered from the apartment, which Hazel later identified as matching hers. The pockets of a pair of sweatpants found near the jewelry contained 21 $100 bills. In addition, the police recovered black and white baseball gloves, a loaded .357 revolver, and receipts from various nearby retail businesses showing purchases made on March 13 and 14, 2013.

Surveillance video footage from the stores showed defendant making purchases at the times listed on the receipts, accompanied by Marquise and Michael Garrett. Hazel was shown a photograph of Marquice Garrett, and said he looked like the first intruder to enter her home. One store video showed defendant, pulling cash from his pocket, wearing sweatpants similar to the ones found at the apartment.

In an interview after his arrest, defendant denied being involved in the robberies or making the purchases recorded on the video footage. Defendant said that he had not left the Arcadia apartment between March 12 and March 14. Detective Duran noted that defendant's voice sounded similar to the voice in the calls made to Ernestine.

Detective Duran also interviewed Marquice Garrett. The interview was recorded, and John recognized the voice as belonging to one of the participants in the home invasion.

Ernestine and Hazel were shown photographs in groups of six to eight and admonished that pictures of the suspects may or may not be included. Hazel identified Marquice Garrett as one of the intruders. Ernestine became "visibly shake[n]" when

4

shown a photograph of defendant and identified him as being involved in the robbery. She also identified Marquice Garrett.

Detective Duran testified as a gang expert about the "Pasadena Denver Lanes" Bloods gang, also known as "PDL." Marquice Garrett had PDL gang tattoos. Defendant had no tattoos, but photographs showed him in PDL territory with PDL gang members. In 2012, defendant admitted to a Pasadena police officer that he was a member of the PDL gang.

Pasadena Police Officer Jordan Ling also testified as a gang expert with expertise on the PDL gang. The gang had over 300 members. Its primary activities are murder, attempted murder, assault with a deadly weapon, residential burglary, and armed robbery. Members could either be born into the gang based on family connections, "crimed" into the gang by committing a crime for the gang, or "jumped" into a gang. In Officer Ling's opinion, Marquice Garrett was a member of the PDL gang, and Michael Garrett had PDL tattoos. Text messages recovered from defendant's cell phone contained indications of affiliation with the PDL gang.

Officer Ling testified that gang members commit violent crimes to benefit their reputation and the gang's reputation. Gang members often share the proceeds of criminal activity with other members, allowing gang members to purchase narcotics, guns, or personal items. Members generally commit crimes in groups of two or more. They rarely bring a nonmember with them to commit a crime.

According to Officer Ling, it is common for family members to be part of the same gang. Officer Ling testified he was aware of four different families in which a male PDL gang member had sons who were also PDL gang members. Officer Ling stated that defendant's father was the highest-ranked member of PDL. However, merely growing up around gang members did not make a person a gang member. Based on defendant's admission that he was a PDL gang member, his photographs, and his presence in PDL territory with gang members, Officer Ling opined that defendant was a PDL gang member. Officer Ling was presented with a hypothetical question based on the facts in

5

the case, and believed that the crimes were committed to benefit the PDL gang as well as individual members.

**Defense**

Defendant did not testify or present evidence.

<u>**DISCUSSION**</u>

## I.  <u>Denial of bifurcation</u>

Prior to trial, the defense filed a motion in limine to bifurcate the gang enhancement allegations, arguing that gang evidence was irrelevant and prejudicial.  The trial court denied the motion, finding that the gang evidence was relevant to the charged offenses and that defendant failed to show undue prejudice.

On appeal, defendant asserts that the trial court erred by denying bifurcation.  He contends that the substantive offenses did not involve overt gang activity, and that the introduction of gang evidence inflamed the jury and created a risk that the jury would believe defendant had a criminal disposition to commit the charged offenses.

We review the trial court's denial of bifurcation of the gang enhancement allegations for an abuse of discretion.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).)  We will disturb the trial court's exercise of discretion only upon "'a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)  Defendant bears the burden of establishing an abuse of discretion.  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225 (*Albarran*).)

In *Hernandez*, the Supreme Court considered arguments for and against bifurcation of gang enhancement allegations.  The court noted that—unlike with prior conviction allegations, which relate to a defendant's status and may have no connection to a charged offense—"the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense.  So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation."  (33 Cal.4th 1040, 1048.)  Certain types of gang evidence can be unduly prejudicial, warranting bifurcation, when they have little relevance to guilt and

6

"threaten[] to sway the jury to convict regardless of the defendant's actual guilt." (*Id.* at p. 1049.) "But evidence of gang membership is often relevant to, and admissible regarding, the charged offense." (*Ibid.*) Moreover, in the interests of economy and efficiency, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Id.* at p. 1050.) Thus, in seeking bifurcation, a defendant faces a burden of clearly establishing a "'substantial danger of prejudice'" requiring that the gang allegations be separately heard. (*Id.* at p. 1051.)

We find that defendant failed to meet this burden. Gang evidence can be relevant at trial of the charged crime when it helps to prove identity. (*Hernandez*, *supra*, 33 Cal.4th 1040, 1049.) In argument below, the defense asserted that the prosecution did not establish that defendant participated in the charged offenses. At trial, there was evidence presented tying Marquice Garrett to the crimes—Hazel and Ernestine both identified him in photographs, John identified his voice, and the surveillance footage video showed him with defendant. There was also evidence that Marquice Garrett was a PDL gang member, that gang members generally only commit crimes with fellow gang members, and that defendant was a PDL gang member. This evidence was relevant to defendant's identity as a perpetrator and was admissible with respect to the substantive offenses.

Gang evidence can also be relevant as to motive. (*Hernandez*, *supra*, 33 Cal.4th 1040, 1049.) Officer Ling testified that residential burglary is a primary activity of PDL, and that gang members often share the proceeds of crimes with other members so that they can purchase personal items. There was evidence that such activity occurred here, which supported the prosecution's showing that defendant had a motive to commit the crimes.

Defendant argues that this case is similar to *Albarran*, in which the introduction of irrelevant and "extremely prejudicial" gang evidence warranted a new trial. (149 Cal.App.4th 214, 217.) The defendant in *Albarran* identified "extremely inflammatory"

evidence—including references to the Mexican Mafia and statements that gang members threatened to kill police officers—that, at most, was only tangentially related to gang allegations and had no bearing on the charged offenses. (*Id.* at pp. 227-228.) In contrast, the gang evidence here was relevant to the underlying offenses as well as the gang enhancements.[3] Furthermore, as noted by the trial court in denying defendant's motion in limine, defendant failed to identify any evidence that was both irrelevant and overly prejudicial. Thus, defendant did not meet his burden of clearly establishing a "substantial danger of prejudice" if the gang allegations were not bifurcated. (See *Hernandez*, *supra*, 33 Cal.4th 1040, 1051.)

Assuming for the sake of argument that the trial court abused its discretion by denying bifurcation, the error was harmless. Under state law, we examine whether it was "reasonably probable" that the result of the trial would have been the same if the gang enhancement allegations were heard separately. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Albarran*, *supra*, 149 Cal.App.4th 214, 229.) As defendant acknowledges in his opening brief, there was a "plethora" of evidence tying him to the crime. It cannot be said that bifurcation of the gang allegations would have had any effect on the jury's verdict.

Defendant argues that we should analyze the purported error under the *Chapman v. California* (1967) 386 U.S. 18 standard, requiring proof beyond a reasonable doubt that the error did not contribute to the verdict. "To prove a deprivation of federal due process rights, [defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.'" (*Albarran*, *supra*, 149 Cal.App.4th 214, 229.) As we explained above, there were credible inferences that the jury could draw from the gang evidence. Defendant is unable

---

[3] Defendant does not argue that the gang enhancements should be reversed for insufficient evidence.

8

to show that he was deprived of his constitutional rights or that the denial of bifurcation otherwise warrants reversal.

## II. __Evidence pertaining to defendant's father__

Defendant contends that the trial court erred by allowing evidence that defendant's father was a member and a leader of PDL.

During direct examination of Officer Ling, the prosecutor and defense approached the bench, and the prosecutor informed the court that he intended to ask Officer Ling about defendant's father's membership in PDL. The prosecutor argued that the question was appropriate because the defense contested defendant's status as a gang member. The court asked defendant's counsel whether defendant's gang membership was a "hotly disputed issue," to which counsel replied, "Oh, absolutely, yes." When asked by the court whether the evidence would be relevant, defense counsel responded, "It think it may certainly be highly relevant. However, it is—I think it's more prejudicial than probative on this issue." The court overruled the defense objection, stating, "It seems to me this is highly relevant on a hotly disputed matter, and this is not unduly prejudicial. It is prejudicial only in the sense that it is very highly probative. The fact that his father is a high-ranking member within the PDL, maybe the head of the gang, would allow for a reasonable inference, coupled with other evidence, that in fact [defendant] is a member." Then, after the prosecutor laid a foundation that PDL included four members who were fathers of sons also in the gang, the prosecutor was allowed to ask about defendant's father. Officer Ling replied that defendant's father was at the "highest rank" in the PDL gang.

Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review the trial court's decision on admissibility of the evidence for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

We agree with the trial court that the evidence that defendant's father was a PDL gang member was relevant to the question of whether defendant was a gang member. Officer Ling testified that members could be "born" into the gang. Defense counsel himself acknowledged that defendant's father's membership was "highly relevant" to the issue of whether defendant himself was a PDL gang member.

We further find that the trial court did not abuse its discretion by admitting the evidence. Evidence does not create undue prejudice if it is merely damaging to the defendant. (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) Instead, "'[t]he "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.'" (*Ibid.*) "'Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Admission of the evidence that defendant's father was a PDL member and leader did not render defendant's trial unfair. It was but one piece of evidence supporting the conclusion that defendant was himself a PDL member. As Officer Ling testified, merely growing up around gang members did not make a person a gang member. Rather, defendant's membership in PDL could also be determined by defendant's prior admission that he was a PDL gang member, photographs of defendant with fellow gang members, and his presence in PDL territory with gang members.

Furthermore, even if introduction of the evidence was overly prejudicial, any error was harmless. There was overwhelming evidence that defendant committed the charged crimes, and the gang enhancement allegations were thoroughly established. In addition, both the prosecution and the defense agreed to the trial court's reading of a jury instruction that stated: "[Y]ou have heard evidence this morning that the defendant's father is a Pasadena Denver Lane member. That evidence alone is not sufficient to conclude that the defendant is a PDL or Pasadena Denver Lane member. To conclude

that the defendant is a Pasadena Denver Lane Member there must be other evidence that convinces you that the defendant is a Pasadena Denver Lane member." The jury was also instructed not to let bias, sympathy, prejudice, or public opinion influence its decision, and was read CALCRIM No. 1403—that gang evidence could only be considered for the limited purpose of intent, purpose, and knowledge required to prove the gang enhancement, and as it related to motive and witness credibility. Considering the overall state of the evidence, in addition to the jury instructions, the jury's guilty verdict cannot be attributed to the evidence relating to defendant's father.

## **DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

11