Filed 4/30/26  P. v. Valdez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>NOE VALDEZ,<br><br>     Defendant and Appellant. | B336447<br><br>(Los Angeles County<br>Super. Ct. No. KA130335) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Jr., Judge.  Affirmed with directions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Noe Valdez of first degree murder and possession of a firearm by a felon. At trial, the People introduced evidence that Valdez is a gang member who shot and killed a gang rival at a gas station. The trial court sentenced Valdez to an aggregate term of 54 years to life in state prison.

On appeal, Valdez argues the trial court violated his constitutional rights by denying his motion for a mistrial, or in the alternative, a continuance, after his trial counsel informed the court that due to his conditions of confinement, Valdez had only approximately one hour of sleep each night before trial. Valdez asserts this sleep deprivation prevented him from assisting in his own defense and from appearing in a dignified manner before the jury. Valdez also claims the court erred in denying his motion to exclude all references to the Mexican Mafia. Additionally, Valdez argues the court erred in denying a mistrial after the prosecution's gang expert offered testimony that violated the court's prior ruling limiting the admission of evidence concerning the Mexican Mafia.

First, assuming arguendo the trial court violated Valdez's federal constitutional rights by denying his motion for a mistrial or a continuance based on his alleged sleep deprivation, we conclude any such error was harmless beyond a reasonable doubt. The People presented overwhelming circumstantial evidence that Valdez perpetrated the murder, including evidence Valdez and the shooter shown in the surveillance footage appeared to have the same facial features and clothing, historical cell site data indicating a telephone associated with Valdez activated a cell tower less than three miles away from the crime scene within a half hour of the shooting, a notebook recovered from Valdez's

residence contained gang graffiti similar to new graffiti found by the gas station the day after the shooting, and Instagram messages Valdez sent to others several days after the crime that indicated he feared apprehension by the police.

Second, Valdez fails to show the trial court abused its discretion in concluding the probative value of evidence showing the number 13 in the new graffiti near the gas station referred to the Mexican Mafia was not substantially outweighed by the danger of undue prejudice. Because Valdez's gang had an allegiance to the Mexican Mafia, the graffiti reinforced the People's theory that a member of Valdez's gang perpetrated the murder. Valdez's assertion the jury would infer from this brief reference to the Mexican Mafia that he was affiliated with a criminal enterprise that was larger and more dangerous than his own gang is speculative.

Third, we reject Valdez's assertion the trial court abused its discretion in denying his motion for a mistrial based on the gang expert's violations of the order limiting the admission of Mexican Mafia evidence. The court did not transgress the bounds of reason in finding the expert's testimony that Valdez's gang clique had been greenlit by the Mexican Mafia and that the latter had a rivalry with another prison gang did not deny Valdez a fair trial.

Lastly, the parties agree that the trial court's minutes and abstract of judgment should be corrected to reflect that the only monetary obligation imposed on Valdez was $6,764.78 in victim restitution. Given the parties' concessions and our rejection of Valdez's other claims of error, we affirm the judgment and instruct the trial court to prepare a corrected minute order and an amended abstract of judgment imposing only victim restitution in the amount of $6,764.78.

3

# FACTUAL AND PROCEDURAL BACKGROUND[1]

We summarize only those facts pertinent to our disposition of this appeal. We describe in greater detail certain trial evidence and aspects of the procedural history in our Discussion, *post*.

## 1. *The information*

The People filed an information charging Valdez with willful, deliberate, and premeditated murder, in violation of Penal Code[2] section 187, subdivision (a) and section 189, subdivision (a) (count 1), and possession of a firearm by a felon, in violation of section 29800, subdivision (a)(1) (count 2). The People further alleged Valdez suffered a prior conviction for a serious or violent felony that constitutes a strike for the purposes of section 667, subdivisions (b) to (j), and section 1170.12.

---

[1] In describing the trial evidence and the procedural history of this case, we rely in part on admissions from the parties' briefing and assertions made by the respondent that Valdez does not dispute in his reply brief. (See *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 772, fn. 2, 773–774 (*Association for Los Angeles Deputy Sheriffs*) [employing this approach]; see also *Reygoza v. Superior Court* (1991) 230 Cal.App.3d 514, 519 & fn. 4 (*Reygoza*) [criminal case in which the Court of Appeal assumed that an assertion made by the respondent was correct because the "defendant did not dispute [the] respondent's claim in his reply"].)

[2] Undesignated statutory references are to the Penal Code.

## 2.    *The People's trial evidence[3]*

At around 9:40 p.m. on January 10, 2022, a group of four males had a verbal altercation with a motorcyclist, Vincent Maldonado, near the air inflation service area at a Mobil gas station in Baldwin Park.  The tallest of the group fired several gunshots at Maldonado.  Maldonado later died of his gunshot wounds.  John H., Davis P., Joshua M., and Brian F. witnessed the incident.[4]

Valdez is a member of the East Side Bolen Parque (ESBP) gang, which has a rivalry with Maldonado's gang, the Des Madres gang.  The police recovered surveillance video from the Mobil station and from the vehicle driven by Brian F.  The surveillance footage revealed that the shooter wore a shirt similar to that Valdez had worn in a photograph on his Instagram page, and that the shooter and Valdez had similar facial characteristics.  Three other ESBP gang members appear in the footage as well.  The day after the shooting, new graffiti was discovered on a wall near the Mobil station that included the

---

[3] We summarize here the evidence the People introduced at trial to provide context for Valdez's appellate challenges.  We note Valdez did not testify in his defense.  We provide additional background related to our analysis in the Discussion, *post*.

[4] Because this case involves a gang-related homicide, we refer to these witnesses by their first names and last initials.  (See Cal. Rules of Court, rule 8.90(b)(10) ["To protect personal privacy interests, in all opinions, the reviewing court should consider referring to the following people by first name and last initial[:] . . . [¶] . . . Persons in . . . circumstances in which personal privacy interests support not using the person's name . . . ."].)

monikers of the three other ESBP members and had the letter "D" crossed out to disrespect Maldonado's gang.

The prosecution introduced other evidence tending to show Valdez was the shooter, including a notebook from Valdez's residence that contained graffiti similar to that found near the Mobil station, and historical cell site information showing that approximately 30 minutes after the shooting, a telephone associated with Valdez's Instagram account had activated a cell tower approximately 2.5 miles east of the Mobil station.

### 3. *The bifurcation of the trial, the jury's verdicts, the trial court's findings at the bench trial on Valdez's alleged prior strike conviction, Valdez's sentence, and his notice of appeal*

The trial court bifurcated trial on the underlying charges from trial on the prior conviction. For the purposes of count 2, Valdez admitted he was previously convicted of a felony. Valdez waived his right to a jury trial on the prior conviction allegation.

The jury convicted Valdez on both counts and found Valdez had committed murder in the first degree. At the bench trial, the trial court found true that Valdez was previously convicted of assault with force likely to produce great bodily injury with a great bodily injury enhancement, and that the prior conviction qualified as a strike.

On December 8, 2023, the trial court sentenced Valdez to an aggregate state prison term of 54 years to life, which consists of a four-year prison sentence for count 2 (i.e., the midterm of two years doubled as a second strike conviction) and an indeterminate term of 50 years to life on count 1 (i.e., 25 years to life doubled as a second strike conviction). On January 16, 2024, Valdez appealed from the judgment.

6

## STANDARDS OF REVIEW

We review for abuse of discretion the trial court's orders denying motions for mistrial or continuance (see *People v. Breceda* (2022) 76 Cal.App.5th 71, 89–91 (*Breceda*)), and its admission of evidence (*People v. Byers* (2021) 61 Cal.App.5th 447, 453). "[R]egardless of the applicable standard of review," "[t]he appellant bears th[e] burden of rebutting the presumption of correctness accorded to the trial court's decision . . . ." (See *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at p. 777.) "[W]e evaluate the harmlessness of violations of the federal Constitution under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], which requires reversal unless the error is harmless 'beyond a reasonable doubt.' [Citation.]" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195–196 (*Gonzalez*).)

## DISCUSSION

### A. Even If Arguendo the Trial Court Erred in Denying Valdez's Motion for a Mistrial or a Continuance Based on His Alleged Sleep Deprivation, That Error Does Not Warrant Reversal of the Judgment

#### 1. *On the second day of trial, Valdez moved for a mistrial or, in the alternative, a continuance*

On Thursday, November 2, 2023, the second day of trial testimony, Valdez's trial counsel represented to the trial court that Valdez had only approximately one hour of sleep each night because of the distant location of Valdez's incarceration at Wayside and certain transportation issues with the sheriff's department. Defense counsel asserted that the previous day,

Valdez was falling asleep during the testimony of witnesses. Valdez's counsel claimed his client indicated he could not follow the proceedings due to lack of sleep. Counsel moved for a mistrial or, in the alternative, to continue the proceedings to Monday to allow Valdez to attain sufficient sleep over the weekend to participate in the remainder of the trial.

The trial court stated it was surprised Valdez was being housed at Wayside during trial. The court indicated it hoped to "get more answers as to [Valdez's] housing situation," and expressed its intention to consider at a later time Valdez's counsel's request for "some type of modification of [the] trial schedule . . . ." The court apologized to Valdez for the circumstances; advised Valdez to do his "best to stay attentive, most certainly before the jury"; stated that Valdez could possibly "get rest during the lunch break" that day and that the court would "do what [it could] to remedy the situation"; and denied Valdez's request for a mistrial, apparently based on the court's belief the housing and transportation concerns identified by defense counsel did not establish that Valdez was unable to assist his attorney.

The trial continued that day with the testimony of additional prosecution witnesses. The following day, additional prosecution witnesses testified. The parties agree that the record does not contain any further discussions regarding Valdez's housing and transportation situation, or on Valdez's request for a mistrial. Valdez does not dispute, and thus tacitly agrees with, the Attorney General's assertion that "[c]ounsel did not make any further claim that [Valdez] was unable to stay awake." (See *Reygoza, supra*, 230 Cal.App.3d at p. 519 & fn. 4.) On Monday, November 6, 2023, the prosecution rested, the jury was

8

instructed, the parties delivered their closing arguments, and the jury commenced its deliberations at 3:25 p.m. The jury reached its verdicts the following morning.

**2.** *Assuming arguendo the trial court violated Valdez's constitutional rights in denying his motion for a mistrial or a continuance, any such error was harmless beyond a reasonable doubt*

Valdez maintains, "[T]he trial court abused its discretion by denying the defense motion for a mistrial," or, in the alternative, to "continue the proceedings until [Valdez's] housing and transportation issues had been resolved to the point where [Valdez] was provided with an opportunity to obtain a sufficient amount of sleep." Valdez asserts the court's refusal to provide him such relief violated his "federal and state constitutional rights to due process, to assist in his own defense, to the effective assistance of counsel," "equal protection,"[5] and "to appear before the jury in a dignified manner." As for the latter alleged constitutional violation, Valdez contends the denial of his motion was prejudicial because "[Valdez's] sleeping and inattentiveness at trial was likely interpreted by jurors as a disinterest or disrespect for the court, jury, and trial, and jurors may have interpreted it as a sign of guilt."

---

[5] Valdez's equal protection claim appears to be premised on his assertion that he would not have been subjected to conditions of confinement that deprived him of sleep if he could have afforded bail. For the reasons set forth above in Discussion, part A.2, any purported denial of equal protection in not granting Valdez a mistrial or a continuance was harmless.

As we noted in our Standards of Review, *ante*, federal constitutional error is reviewed under the *Chapman* standard of prejudice, that is, the error is subject to reversal unless it was harmless beyond a reasonable doubt.[6]

Preliminarily, we note there is no dispute that *someone* shot and killed Maldonado on the evening of January 10, 2022. In fact, Valdez acknowledges in his appellate briefing that "the shooting was captured on surveillance video . . . ." The parties instead quarrel over whether the factfinder still would have found that *Valdez* shot Maldonado if the trial court had granted a mistrial or a continuance to remedy Valdez's alleged sleep deprivation.

Valdez contends, "Not a single eyewitness identified [Valdez] as the shooter or as one of the four males in the group at the Mobil station." In particular, he argues John H. "was shown a lineup that included [Valdez's] photograph and was unable to make a definitive identification"; Brian F. "expressed only a 'strong inclination' toward [Valdez's] photo because of his lean face, but was not confident in his choice"; Joshua M. "explicitly stated that the people in the photo array that included [Valdez] were 'way too old' "; and Davis P. "made no identification at all, and during a prior hearing, [he] stated that none of the individuals involved in the shooting were [*sic*] present in court." Valdez further argues the "surveillance video [introduced at trial] did not clearly depict the shooter's face." Lastly, Valdez insists

---

[6] Valdez does not assert the trial court committed structural error that is reversible per se. (See *Gonzalez*, *supra*, 5 Cal.5th at p. 196 [noting that "structural error results in per se reversal" regardless of "[w]hether [that error is a] violation of state law or federal constitutional law"].)

"[t]he cell phone records [presented at trial] did not place [Valdez] at the scene at the time of the shooting." As we explain below, other evidence presented at trial persuades us, beyond a reasonable doubt, that Valdez would have been convicted of the instant offenses even if the trial court had granted his motion for a mistrial, and then conducted a new trial after Valdez attained more sleep, or granted a continuance so that Valdez could get more rest before the trial resumed.

First, Valdez admits in his appellate briefing that Detective "Rodas testified that [Valdez] had similar facial features to the shooter, as seen in the [surveillance] video, as reflected in a photograph of [Valdez] from his Instagram account, and the shirt worn by the shooter was similar to one [Valdez] was wearing in the [Instagram] photo." Indeed, Detective Rodas testified the individual in the surveillance video, shown in the still image marked as People's exhibit 95B, and Valdez, shown in the photograph marked as People's exhibit 95A, both had a "similar nose[, s]imilar eyebrows," and similar facial hair. Detective Rodas further testified that the shirt depicted in each image bore the following similarities: "The cursive writing in the middle of the sweater, what appears to be the Adidas logo on the chest portion, and then an unknown circle on the other, opposite direction." Although we observe the image in People's exhibit 95B does not clearly depict the shooter's face, our review of People's exhibits 95A and 95B substantiates Detective Rodas's testimony as to the similarities between Valdez and the individual in the other image.

Next, in their briefing, the parties agree that the prosecution introduced "historical cell site" evidence for the telephone the police recovered from Valdez's residence after the

11

shooting.[7]  They also acknowledge that although this evidence did not disclose the telephone's "location at the time of the shooting at 9:40 p.m.," those records did reveal that "[a]t 10:06 p.m., the [tele]phone activated a [cell] tower approximately two and a half miles east of the crime scene."

Further tying Valdez to the shooting is evidence of his membership in a gang that had a rivalry with Maldonado's gang. Detective Rodas testified ESBP gang members Victor C., Joel L., and Samuel O. were depicted in the surveillance video obtained from the Mobil station,[8] and Valdez admits in his briefing that Joshua M. identified Samuel O. and Joel L. as two of the males in the group he saw at the station.  Valdez also acknowledges the prosecution presented evidence that Victor C.'s moniker ("Gangster"), Joel L.'s moniker ("Bandit"), and Samuel O.'s moniker ("Fighter") appeared in new graffiti found on an embankment wall near the Mobil station the day after the shooting, as did the notations:  "ESPRS," "Bolen," and "Dodger." The prosecution's evidence showed that a notebook seized from Valdez's residence contained handwritten ESBP graffiti, including a page that had Samuel O.'s moniker ("Fighter").  The parties also acknowledge in their appellate briefing that the People presented evidence that another page of the notebook had

_____

[7]  Although the subscriber listed for this telephone was "Martin Valdez," the telephone number was associated with defendant Valdez's Instagram account.

[8]  Because these three individuals were minors on the date of the crime, we refer to them by their first names and last initials.  (See Cal. Rules of Court, rule 8.90(b)(10).)

Additionally, the surveillance video is not in the record before us.

the notations "ESBPRS" and "DODGER" written in green ink, which Detective Alvarado noted was similar to the new graffiti found near the gas station.

The parties further represent on appeal that Detective Rodas testified tattoos Valdez had on his chest, neck, and head could only belong to a member of ESBP who was in good standing and actively engaged in criminal conduct. Importantly, the parties do not dispute the prosecution proffered evidence that: Maldonado admitted to being a member of the Des Madres gang, one of ESBP's rivals is "Southside Des Madre," and the graffiti found near the Mobil station the day after the killing "had many letters crossed out . . . as disrespect to ESBP rivals," e.g., "[t]he D's in 'Bandit' and 'Dodger' were crossed out to disrespect Des Madre."[9]

Content from Valdez's Instagram account further suggested he was involved in Maldonado's murder. The account included a photograph of Valdez displaying an "R" hand sign, representing Rascals, which Detective Rodas testified is a subset of ESBP. Valdez's Instagram account also had a screenshot from a rap music video featuring Valdez, Samuel O., and other ESBP members. Further, Valdez sent messages to other Instagram users suggesting that within two weeks after Maldonado was

---

[9] Although the People's evidence showed Maldonado had admitted to being a member of "Des Madres," Valdez does not argue this organization differs from the "Des Madre" gang that had been disrespected in the graffiti found near the Mobil station the day after the shooting. Instead, Valdez suggests in his reply brief the prosecution did in fact offer evidence supporting its theory that "[Valdez] and . . . Maldonado were members of rival gangs . . . ."

shot, Valdez decided to no longer use the telephone police later recovered from his residence. Approximately 12 days after the shooting, Valdez sent an Instagram message to another user indicating Valdez did not like the fact Valdez was unarmed; Valdez also stated "the hood is hot right now" and "Detective are [*sic*] everywhere."

In sum, the People presented overwhelming circumstantial evidence implicating Valdez in the shooting, including evidence that Valdez shared the shooter's attire and facial characteristics, Valdez had associated with ESBP gang members who were at the crime scene, Valdez had a notebook containing graffiti similar to that found at the gas station the day after the killing, Valdez belonged to a gang that had a rivalry with Maldonado's gang, Valdez possessed a telephone that had activated a cell tower near the crime scene shortly after the shooting, and Valdez feared apprehension by the police days after the murder. Based on the evidence discussed above, we conclude, beyond a reasonable doubt, that Valdez would have been convicted of first degree murder and possession of a firearm by a felon even if he had been granted a mistrial or a continuance to remedy his purported sleep deprivation. Accordingly, Valdez's claim of constitutional error does not warrant reversal under *Chapman*'s standard of prejudice.

## B. The Trial Court Did Not Abuse Its Discretion In Denying Valdez's Motion To Exclude Any Reference to the Mexican Mafia

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create

14

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review the trial court's admission of evidence for abuse of discretion. (Standards of Review, *ante*.)

Valdez moved to exclude any reference to the Mexican Mafia under Evidence Code section 352. Based on the prosecution's representation that "the wall graffiti contains the number 13," which is associated with the Mexican Mafia, the trial court denied Valdez's motion and authorized the People to present evidence showing that the number "13 when written in gang graffiti shows affiliation or allegiance to [the] Mexican Mafia . . . ." The court barred the prosecution from "expla[ining] . . . what the Mexican Mafia is or . . . what [it does] in terms of controlling local street gang activity."

On appeal, Valdez argues, "[T]he trial court abused its discretion by failing to exclude all references to the Mexican Mafia" "because such evidence lacked probative value while its prejudicial impact was significant." Although Valdez acknowledges that "[t]he prosecutor's theory of the case was that Maldonado was shot by [Valdez] because they were members of rival gangs," Valdez maintains, "Any affiliation or association that the ESPB [*sic*] gang or the Rascals clique had with the Mexican Mafia . . . was completely irrelevant in establishing the motive for the homicide and the identity of the shooter." Valdez further contends that "Mexican Mafia evidence is uniquely inflammatory and creates a substantial danger that the jury will improperly infer a criminal disposition." Additionally, Valdez argues the trial court's alleged error in denying his motion to exclude all references to the Mexican Mafia under Evidence Code

15

section 352 " 'had the additional legal consequence of violating [his federal] due process [rights].' "

As an initial matter, we reject Valdez's assertion that evidence of "ESBP's affiliation or allegiance to the Mexican Mafia was [not] *relevant* in proving motive and/or identity." (Italics added.) Testimony that the graffiti was spray painted by members of a gang that has an allegiance to the Mexican Mafia has a tendency to show that a member of ESBP committed Maldonado's murder, given the People's evidence that ESBP is one such gang that has an allegiance to the Mexican Mafia.[10] Although the prosecution introduced other evidence that Maldonado was killed by a rival gang member (see Discussion, part A.2, *ante* [describing that evidence]), the fact remains that the evidence connecting the number 13 in the graffiti to the Mexican Mafia provided further support for the People's gang rivalry theory. (See Evid. Code, § 210 [defining "[r]elevant evidence" as that "having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," italics added].) Further, when considered with other evidence suggesting Valdez was the perpetrator (see Discussion, part A.2, *ante*), this Mexican Mafia evidence reinforces the conclusion that Valdez was the ESBP member who shot Maldonado. For instance, the evidence that police recovered a notebook from Valdez's residence that contained ESBP graffiti similar to that found by the gas station the day after the murder further suggests Valdez was the ESBP

---

[10] On appeal, Valdez acknowledges, "[T]he gang expert testified that the 13 in the ESBP gang graffiti . . . showed the gang's allegiance to the Mexican Mafia . . . ."

16

member who committed the murder.  (See Discussion, part A.2, *ante*.)

Accordingly, Valdez may prevail on his claim of error only if he shows the trial court abused its discretion in ruling that the probative value of this reference to the Mexican Mafia was not substantially outweighed by the danger of undue prejudice attendant with its admission.  Valdez maintains that upon hearing this evidence, "the jury likely . . . believed that [Valdez] and his gang were part of a larger and more dangerous criminal enterprise," giving rise to "a danger that the jury would use it as propensity evidence."  Because the trial court did not permit the prosecution to present any evidence concerning the Mexican Mafia other than a brief explanation that ESBP had an allegiance to that organization, the jury had no basis to infer that the Mexican Mafia was larger and more dangerous than ESBP.

Valdez cites Division Seven's decision in *People v. Albarran* (2007) 149 Cal.App.4th 214 for the proposition that "[t]he Mexican Mafia evidence was extremely inflammatory, could have only interfered with the jury's resolution of the issues, and posed a danger that the jury would use it as propensity evidence."  Valdez's reliance on *Albarran* is unavailing.

In *Albarran*, a jury convicted the defendant of attempted murder, shooting at an inhabited dwelling, and attempted kidnapping for carjacking, and found true enhancements under section 186.22 that the defendant committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members.  (See *Albarran*, *supra*, 149 Cal.App.4th at pp. 217, 219.)  Under the prosecution's theory of the case, the defendant perpetrated these crimes with "an

17

unidentified accomplice . . . ." (See *id.* at pp. 217–219, 227, fn. 9.) Although there was evidence that the defendant was "a member of the 13 Kings street gang" (see *id.* at p. 220), "[t]here [was] nothing inherent in the facts of the [offenses] to suggest any specific gang motive" (see *id.* at p. 227). Prior to trial, the trial court denied the defendant's motion under Evidence Code section 352 to exclude any evidence of the defendant's gang affiliation and evidence concerning whether the crimes were gang related. (*Albarran*, at pp. 219–220.) The court reasoned the evidence was admissible to prove "motive and intent as to the underlying charges." (See *id.* at p. 220.)

During opening argument, "[t]he prosecutor . . . showed a picture of [the defendant's] gang tattoos, describing one of the tattoos as a 'reference to the Mexican Mafia, which is a violent prison street gang that controls the Hispanic street gangs[,]' " and stated that "when a person has such a tattoo it shows allegiance to the Mexican Mafia." (See *Albarran*, *supra*, 149 Cal.App.4th at p. 220.) Similarly, the prosecutor's gang expert "explained [at trial that the defendant] had a number of tattoos, including one referencing the Mexican Mafia." (See *id.* at pp. 219–220.) The expert also "described one piece of graffiti he attributed to [the defendant's] gang which contained a specific threat to murder police officers,"[11] "told the jury the 13 Kings

---

[11] There was no evidence that the defendant or his unidentified accomplice created this graffiti to take credit for the offenses at issue. (See *Albarran*, *supra*, 149 Cal.App.4th at p. 227 ["There was no evidence presented that any gang members had 'bragged' about their involvement [in the shooting] or created graffiti and took credit for it."].) Instead, it seems the gang

18

committed a number of criminal offenses, including robberies, driveby shootings, carjackings, and felony vandalism[,] . . . [and] explained how gang members gain respect by committing crimes and intimidating people." (*Albarran*, *supra*, 149 Cal.App.4th at pp. 220–221.) During his closing argument, the prosecutor "told the jury that the crime was gang motivated[,] . . . argued that because [the defendant] was a gang member his alibi was unbelievable[,] . . . [and] reminded the jury that [the defendant] was an active member of the 13 Kings with gang tattoos." (See *id.* at p. 222, fn. omitted.)

After the jury returned its verdicts, the trial court granted the defendant's motion for a new trial as to the gang enhancements on the ground they lacked sufficient evidentiary support, but denied his motion for a new trial as to the underlying charges, thereby rejecting the defendant's argument that "absent the gang allegations, the gang evidence was irrelevant and overly prejudicial." (See *Albarran*, *supra*, 149 Cal.App.4th at pp. 217, 222, 226–227.)

The Court of Appeal reversed, reasoning that, even if "evidence of [the defendant's] gang membership and some evidence concerning gang behavior were relevant to the issue[s] of motive and intent," "a panoply" of "other extremely inflammatory gang evidence was admitted" that was "irrelevant, cumulative and presented a substantial risk of undue prejudice," "i.e., threats against police, reference to the Mexican Mafia, and descriptions of other crimes committed by other gang members . . . ." (See *Albarran*, *supra*, 149 Cal.App.4th at pp. 217,

---

expert was simply referring to "13 Kings graffiti around [the defendant's] home." (See *id.* at p. 220.)

227–228.)  Further, the *Albarran* court agreed with the defendant that "the erroneous admission of this evidence was so serious as to violate his federal constitutional rights to due process, rendering his trial fundamentally unfair" because "there was a real danger that the jury would improperly infer that whether or not [the defendant] was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished."  (See *id.* at pp. 229–231.)  "Given the nature and amount of this gang evidence at issue, the number of witnesses who testified to [the defendant's] gang affiliations and the role the gang evidence played in the prosecutor's argument," the reviewing court reversed under *Chapman*'s standard of prejudice.  (See *id.* at pp. 229, 232.)

*Albarran* bears little resemblance to the instant case. There, the prosecution's references to the Mexican Mafia "had no connection to the[ ] crimes" at issue because "the motive for the underlying crimes . . . was not apparent from the circumstances," e.g., "[t]here was no evidence presented that any gang members had 'bragged' about their involvement or *created graffiti* and took credit for it"; the prosecutor told the jury that the defendant had a tattoo showing allegiance to the Mexican Mafia, which the prosecutor represented was " 'a violent prison street gang that controls the Hispanic street gangs' "; and the Mexican Mafia evidence was accompanied by "extremely inflammatory gang evidence" that "raised the distinct potential to sway the jury to convict regardless of [the defendant's] actual guilt," including "threats to kill police officers" and "descriptions of the criminal activities of other gang members . . . ."  (See *Albarran*, *supra*, 149 Cal.App.4th at pp. 220, 227–228, italics added.)

Conversely, as explained above, the evidence connecting the number 13 in the gang graffiti near the Mobil station to the Mexican Mafia supported the People's theory that an ESBP member committed the murder to eliminate a rival gang member, and the trial court limited the extent to which the Mexican Mafia could be referenced, thereby preventing the prosecution from introducing a "panoply of incriminating gang evidence . . . [that] had no bearing on the underlying charges." (See *Albarran, supra,* 149 Cal.App.4th at p. 227.) Because the probative value of the Mexican Mafia evidence in the instant case was greater, and the danger of undue prejudice considerably lower, than that of the irrelevant gang evidence at issue in *Albarran,* that decision does not demonstrate the trial court abused its discretion in denying Valdez's motion.

In sum, Valdez fails to demonstrate the trial court erred in denying his motion to exclude any reference to the Mexican Mafia at trial.

C. **The Trial Court Did Not Abuse Its Discretion In Denying Valdez's Motion for a Mistrial Based on the Introduction of Mexican Mafia Evidence Exceeding the Scope of the Court's Prior Ruling**

1. *The trial court denied Valdez's motion for a mistrial even though Detective Rodas provided testimony that violated the court's prior order*

At trial, Detective Rodas testified that the three dots and two lines next to "ESBPRS" in the ESBP graffiti found on the wall outside the Mobil station the day after the murder refers to the number 13, which shows the gang's allegiance to the Mexican Mafia. (Punctuation omitted from the quotation.) In response to

21

the prosecutor's question concerning the significance of the color green in the graffiti, Detective Rodas stated, "The color green is used by specifically this click [*sic*] within the east side. Many years ago — the history told to me by gang detectives and gang members from the Rascals click [*sic*], many years ago they were what is called green lit by the Mexican Mafia, meaning they were in bad standings [*sic*] within the Mexican Mafia . . . ."[12]

The prosecutor also asked Detective Rodas why certain letters in gang monikers found in the graffiti had been crossed out. In his response, Detective Rodas testified, inter alia, "The letter 'N' [in 'Gangster'] is spelled backwards and also crossed off. The 'N' is spelled backwards to disrespect Nuestra Familia which is another prison gang that is north of Bakersfield that doesn't get along with the Mexican Mafia. It is also crossed off because North Side Bolen Parque is the primary rival to East Side Bolen Parque."

Valdez moved for a mistrial, arguing that Detective Rodas's testimony exceeded the scope of the trial court's prior ruling limiting the admission of Mexican Mafia evidence. In denying Valdez's motion, the court acknowledged that two aspects of Detective Rodas's testimony violated the court's prior order: (1) "mentioning that, at one point in time, [the] . . . gang was greenlighted by the Mexican Mafia, and they adopted a green color when . . . graffitiing their gang affiliation"; and (2) noting

---

[12] In ruling on the motion for a mistrial that we discuss in this section, the trial court seems to have construed this portion of Detective Rodas's testimony to mean that the ESBP gang "may be more in allegiance" with the Mexican Mafia "despite falling out of favor [with the Mexican Mafia] at one point in time." Valdez does not contest that interpretation of this testimony.

that the letter "N" included in the gang graffiti had been written in such a way as to show "disrespect to a different prison gang, Nuestra Familia, which is a rival state prison gang to the Mexican Mafia." The court found Valdez had not been denied a fair trial because the Mexican Mafia's greenlighting of the Rascals was mentioned but not explored, and the other testimony had "somewhat tangentially" referred to "rivalry between prison gangs . . . ." The court stated it would not issue a curative instruction because doing so would simply "highlight" these aspects of the expert's testimony.

> **2.** *Valdez fails to demonstrate the trial court erred in denying his motion for a mistrial*

" ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " [Citation.]' [Citation.]" (*Breceda*, *supra*, 76 Cal.App.5th at p. 89.)

According to Valdez, even if we reject his contention the trial court erred in "allowing the prosecution to introduce a limited amount of Mexican Mafia evidence," the court nonetheless erred in denying his motion for a mistrial. He claims the prosecution's violations of the court's order limiting the Mexican Mafia evidence "rendered [Valdez's] trial fundamentally unfair in violation of [his] constitutional rights to due process" because the testimony in question "had no relevance to the issues and was extremely prejudicial."

23

Valdez does not, however, challenge the trial court's finding that Detective Rodas did not expound upon his testimony that the Mexican Mafia had "greenlit" the Rascals clique or his testimony that there is a rivalry between the Mexican Mafia and another prison gang named Nuestra Familia. In concluding that these brief allusions to the Mexican Mafia's status as a prison gang and its relationship to other gangs did not deprive Valdez of a fair trial, the court acted within "the bounds of reason . . . ." (See *Breceda*, *supra*, 76 Cal.App.5th at p. 90; *ibid.* [utilizing the quoted text as a formulation of the abuse of discretion standard in reviewing the denial of a mistrial motion].)

## D.  The Parties Agree Certain Modifications Should Be Made to the Trial Court's Minutes and Abstract of Judgment

The parties agree that we should "order the trial court to correct its minutes and prepare an amended abstract of judgment that accurately reflects that the trial court suspended and never imposed [any] fines and fees other than victim restitution" in the amount of $6,764.78. We thus instruct the trial court to issue a corrected minute order and an amended abstract of judgment indicating that the only monetary obligation imposed on Valdez is $6,764.78 in victim restitution. (*In re Lynex* (2026) 118 Cal.App.5th 756, 769 [" ' "An express concession or assertion in a brief is frequently treated as an *admission* of a *legal* or factual point, *controlling* in the disposition of the case[.]" ' "].)

24

## DISPOSITION

We affirm the trial court's judgment. Upon issuance of our remittitur, the trial court shall prepare a corrected minute order and an amended abstract of judgment reflecting that the court did not impose any fines or fees except for victim restitution in the amount of $6,764.78. The trial court shall forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

WEINGART, J.

M. KIM, J.

25